## Case No. 4,209.

### DUTTON v. The EXPRESS.

[3 Cliff. 462.][1]

Circuit Court, D. Maine. Sept. Term, 1871.

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

A. A. Strout and G. P. Dutton, for libellant. Geo. F. Talbot and Hale & Emery, for claimants.

CLIFFORD, Circuit Justice. Masters of vessels are selected and appointed by the owners, and the owners are responsible that the master is qualified for the situation. Vested as the owners are with the power of appointment, they are under obligations to employ persons possessing reasonable skill and judgment in the performance of their duties, but they do not contract that they shall possess such qualities in an extraordinary degree, nor are they insurers that the masters, in any given emergency, shall do what after the event others may think would have been best, if it appear that they exercised reasonable skill and judgment in view of the impending peril. The Niagara, 21 How. [62 U. S.] 22; The Star of Hope, 9 Wall. [76 U. S.] 230.

Compensation for the damage occasioned to the schooner by her grounding at the entrance of the western channel of the river is claimed by the libellant upon the ground that the master of the steam-tug contracted to tow the schooner down the river by the eastern channel, and that he committed a breach of the contract in attempting to enter the western channel, and that he was guilty of negligence and carelessness in the performance of his duties as master of the steam-tug. Suppose the disaster was occasioned by the negligence or carelessness of the master of the steam-tug, or by his want of due skill and judgment in the performance of his duties, it is quite clear that the owners of the steam-tug would be responsible to the libellant for the injuries received by the schooner, even if no such contract was made as that alleged in the libel, but the inquiry whether or not such a contract was made becomes a matter of much importance in determining the question whether there was any such negligence and carelessness or want of due skill and judgment as is supposed in the charge made by the libellant. He alleges in the libel that the master of the schooner directed the master of the steam-tug to take the eastern channel of the river, and not the western, in towing the schooner down the river, and that the master of the steam-tug signified his assent to that direction. Direct testimony to that effect is given by the master of the schooner, and the record shows that he is confirmed by other witnesses.

On the day alleged in the libel, the schooner, before she was taken in tow by the steam-tug, was lying at Hall's lower wharf, loaded with two thousand two hundred cedar sleepers for railroads, and with eight thousand feet of spruce planks,—eight or nine hundred of the sleepers being stowed on the deck of the vessel. Her deck load was seven and a half feet high, or five feet above the rail. Inquiry was made of the master of the schooner, by the master of the steam-tug, early in the morning, before high tide, whether the schooner would be ready to go down the river during that tide, and the testimony shows that the master of the schooner answered the inquiry in the affirmative, and that the master of the steam-tug stated in reply, that he had an engagement to tow two vessels down the river to Tinker's wharf, and that he would return when that service was performed, and take the schooner in charge. About eight o'clock, just before high tide, the steam-tug returned from the performance of that service, and it ap-

peared that she came up the eastern channel, passed the steamboat wharf, and came alongside the schooner, where she was lying heading down the river. Some conversation took place between the master of the steam-tug and the master of the schooner, at that time each standing on the forward part of his vessel, as they were lying starboard and starboard, their bows only lapping. Undoubtedly the master of the steam-tug came alongside to take the schooner in tow, in pursuance of the previous conversation, and the testimony of the master of the schooner is, that he asked him if the schooner was ready to start, and that he told him that she was, excepting that his cook was ashore, and that he would come on board immediately. Responsive to that, the master of the steam-tug said it was getting near high water, and that it was about time to go; to which the master of the schooner replied, that he need not wait for the cook; that he might at once make fast to the schooner; and he also testified that he told the master of the steam tug that he wanted him to tow the schooner by the eastern channel; that the master of the steam-tug asked him how much water the schooner drew; that he told him that she drew eight and a half feet strong: and that the master of the steam tug stated that he could take the schooner out by the western channel if she did not draw more water than her master represented. Then follows the important conversation which, if true, proves the contract substantially as alleged in the libel. Evidently the sentence last reported was intended as a proposition to tow the schooner through the western channel; but the master of the schooner testifies that he immediately replied that he dared not attempt the western channel, as that channel was obstructed, and his deck load was so high he was afraid of getting upset; that if he would take the schooner down the eastern channel, he, the master of the schooner, was ready to proceed; but if not, to let the schooner remain where she was, as he would not attempt to go by the western channel, and he also testifies that the master of the steam-tug said, "Pass your lines then," "Give us your lines," and that he gave them the lines, supposing they were to go by the eastern channel. Express confirmation of the statements of the master of the schooner in respect to the alleged contract is found in the testimony of several witnesses, examined by the libellant, especially in that of the pilot of the steam-tug, and that of two seamen stationed on the forward part of the schooner at the time the arrangement was made between the masters of the respective vessels. Attempt is made to impeach the credit of the pilot as a witness, by showing that his general reputation for truth and veracity is bad, and several witnesses were examined by the respondents, who have testified to that effect.

Witnesses were also examined upon that subject by the libellant, who testify that they have never heard his reputation in that behalf questioned; but it is not necessary for the court to enter much into that inquiry, as the statements of the master of the schooner in respect to the alleged contract are satisfactorily confirmed, even if that of the pilot is not entitled to belief. Support to the substance of his testimony is also derived from the testimony of the master of the steam-tug, who was examined by the respondents. His attention was directly called to the subject of the alleged contract, and he fails to contradict the most important portion of the testimony of the master of the schooner. He denies explicitly that there was anything said on his part about the eastern channel, but he does not deny that the master of the schooner told him that the western channel was obstructed, that he did not dare attempt to go out by that channel, that his deck load was so high that he was afraid of getting upset, nor does he deny that the master of the schooner told him to let his schooner remain where she was lying unless he would take her down the eastern channel. Silent acquiescence on the part of the master of the steam-tug in the final terms proposed by the master of the schooner was as effectual to close the contract as an express assent would have been, as he must have known that the lines of the schooner were passed to him with the distinct understanding on the part of her master that he was to take the eastern channel of the river in performing the towage service. Confirmation of the theory of the libellant, that the masters of both vessels understood, when the trip was commenced, that the schooner was to be towed down the river through the eastern channel, is also derived from the course pursued in leaving the wharf where the schooner lay, and from that moment until the master of the steam-tug gave the order to the schooner to port her helm, just before the disaster occurred. Considerable conflict exists in the testimony, but when considered as a whole it is persuasive and convincing that the distinct understanding between the masters of the schooner and steam-tug was that the schooner was to be towed down the eastern channel. Different modes of towing are adopted by different tow-boats, or even by the same tow-boat on different occasions. Where the tow is lashed to the side of the steam-tug and depends entirely upon the latter as well for steerage as for motive power, the responsibility for the navigation of both is wholly on the steam-tug, as the tow is as completely under the control of the steam-tug as if she was a part of that vessel. The Johnson, 9 Wall. [76 U. S.] 151. Cases arise, however, where the tow is propelled by a hawser extending from the forward part of the tow to the stern of the steam-tug, and in such cases both vessels have duties to

perform, and it may happen that the steam-tug or tow, or both, may be in fault, according to the circumstances. Sturgis v. Boyer, 24 How. [65 U. S.] 121; The James Gray, 21 How. [62 U. S.] 192.

Tow-lines were used in the case before the court, and it appears that they were fastened to the windlass bitts of the schooner, and to the tow-post constructed for the purpose near the stern of the steam-tug, and that the two vessels were fifty feet apart, as they proceeded down the river. Masters of vessels in tow in such cases are bound to obey all the proper orders of the master of the steam-tug, as the chief responsibility for the navigation of both vessels rests upon that officer, and if the master of the tow refuses such obedience, or is guilty of negligence and carelessness, or want of due skill and judgment in the performance of his duties, the owners of the steam-tug are not liable for the consequences to the owners of the tow. Somewhat different rules apply in cases where the rights of third persons are involved, but where the controversy is between the owners of the steam-tug and the owners of the tow, it is clear that the owners of the former are not liable if the disaster was occasioned by the fault or misconduct of those in charge of the other vessel.

Suppose such a contract was made as that alleged in the libel, still the respondents contend that they are not responsible to the owner of the schooner in the case before the court, because they insist that the disaster was occasioned by the carelessness and negligence of the master of the schooner, and by his refual or neglect to obey promptly the order of the master of the steam-tug. Prior to the circumstance in question, the testimony clearly shows that the course pursued was the proper one for the vessels of the kind intending to take the eastern channel, but the weight of the evidence shows that a change became necessary in order to enter the western channel. and the theory of the respondents is, that the master of the steam-tug, in order to effect that change, gave the order to port the helm, and that the master of the schooner, instead of obeying that order first, hove the wheel to starboard, turning the schooner a point or so in the wrong direction, before he attempted to execute the proper order, and they insist that it was that mistake, in connection with the delay which ensued in putting the helm to port, which caused the disaster in attempting to enter the western channel. Instead of that, the theory of the libellant is, that the mistake which caused the disaster was made by the master of the steam-tug; that he first gave the order to starboard before he gave the order to port, and that the master of the schooner immediately obeyed that order, and that he also attempted to obey the other as soon as it was given, but that it was impossible. as the helm dragged in the obstructions which had accumulated in that part of the channel.

Mills of various kinds, for the manufacture of lumber, are situated above on the river, and the navigation at several points, as more fully explained in the testimony, is much obstructed by slabs, sawdust, and edgings, which have floated down the river and rest in large masses upon the bottom. Numerous witnesses were examined on the one side and on the other in support of these conflicting theories, in whose testimony was given every circumstance which either party could invoke in support of his particular theory, including the description of the condition of the channel, the course of the two vessels, and everything which was said or done on board either vessel before the disaster. Beyond all question the master of the schooner did have his helm to starboard before he put the helm to port, and it is equally clear that the proper order to be given on the occasion, if the intention was to enter the western channel, was to port the helm, as it was necessary that the schooner should turn to the right for that purpose. Throughout the trip her course had been the proper one, to pass down the eastern channel to the place of destination, as arranged between the masters of the respective vessels, and the circumstances considered together leave no doubt in the mind of the court that the master of the schooner, and every one on board that vessel, understood that in continuing the trip they were to pass through that channel to the place of destination, as arranged between the masters of the respective vessels before they started.

Whether the master of the steam-tug actually gave the order to starboard before he gave the order to port is left in doubt by the evidence. Perhaps the better opinion is that he did not, but whether he did or not, it is proved to the entire satisfaction of the court that the responsibility of the mistake, whether it was made by the master of the steam-tug. as is supposed by the libellant, or by the master of the schooner, as is supposed by the respondents, properly belongs to the master of the steam-tug, as he caused it to be made by the other vessel or by her master. Viewed in any light consistent with the evidence, he was responsible for the consequences, as it is shown to the entire satisfaction of the court that he either caused the disaster by giving a wrong order, or, what is more probable, he was the procuring cause of the same, by misleading the master of the schooner and suffering him to continue to suppose that they were going by the eastern channel, when in point of fact he, as master for the time being of both vessels, had determined to go by the other. Concede, for the sake of the argument, that the power to direct the course of the trip was vested in the master of the steam-tug, still the conclusion can-

not benefit the appellants, as it is clear that, having agreed to go by the eastern channel, he could not properly attempt to go by the other without giving reasonable notice to the master of the other vessel of such intention, as he must have known that the agreement would necessarily tend to mislead the other party in the performance of his duty as master of the schooner which he had in tow. Intentional disobedience of orders is not imputed to the master of the schooner, and, if it were, the imputation could not be sustained for a moment, as there is not a fact or circumstance in the case to support such a theory. Evidence, as before remarked, is not wanting to show that the master of the schooner was directed to starboard before he was directed to port, but the better opinion is that he did not correctly understand the order, and, knowing what the contract was, assumed that it was an order to starboard, which would have been the proper order if the intention had been to go by the eastern channel. Caused as the mistake was, either by the omission of the master of the steam-tug to give reasonable notice to the master of the schooner that he had determined not to fulfil his contract and go by the eastern channel, or by his own improper order to starboard, the court is of the opinion that the defence that the disaster was occasioned by the negligence, carelessness, or want of skill and knowledge of the master of the schooner is not sustained.

Argument to show that some portion of the injuries received by the schooner were occasioned by the grounding of the vessel is unnecessary, as the evidence to support the proposition is too full to require any comments to enforce it; but the respondents insist that certain other portions of the injuries might have been prevented if the master had removed his deck load, or even shifted it from one side of the vessel to the other, or if he had taken any proper precaution in the emergency. Injuries occasioned by the grounding of the vessel, it is conceded, constitute a proper charge to the claimants if the disaster was in fact occasioned by the fault of the master of the steam-tug, but it is insisted that the additional injuries occasioned by the heeling over of the schooner do not fall within the same category. Defences of the kind just mentioned are more particularly for the consideration of the master, as they do not constitute an answer to the entire cause of action set up in the libel; but the court has looked into the record, and is of the opinion that the charge of negligence made against the master of the schooner is not sustained by the proofs. Much greater reason exists to conclude that the master of the steam-tug was guilty of fault, in prematurely abandoning the schooner which he had in tow, than to suppose that the master of the schooner was guilty of any culpable omis-

sion to save the vessel from further injury.

Complaint is also made that the master of the schooner at the time the contract was made was guilty of misrepresentation as to the draught of the schooner when loaded; but the charge is wholly unsupported by proof, and is therefore dismissed without further remarks. Error in the amount awarded is not alleged in argument, nor is it necessary to re-examine that question, as the parties waived the usual reference to a master, and the clear inference from the record is, that both parties acquiesced in the finding of the court as to amount.

Decree affirmed with costs.