### THE W. J. KEYSER.

#### EXPORT COAL CO. v. KEYSER et al.

(Circuit Court of Appeals, Fifth Circuit. June 20, 1893.)

No. 111.

1. TOWAGE—ABANDONMENT—LIABILITY OF TUG.
    The master and crew of a coal barge in tow of a tug in the Gulf of Mexico gave a distress signal, and lowered a boat, whereupon the master

of the tug cut the tow line to rescue the crew. The men, on being picked up, stated that the barge was in a sinking condition, and refused to return to her, and the tug, after staying by for an hour or two, but making no effort to regain or save the barge, finally abandoned her. The wind was blowing 30 miles an hour, with a high sea. The crew of the barge consisted of a master, engineer, and three men, and she was provided with engine, boiler, pumps, sails, and anchors, but no motive power. *Held*, that the quitting of the barge by her master and crew, without the intention of returning, severed the legal relation created by the contract of towage between her and the tug.

2. SAME—CONCURRENT NEGLIGENCE.

The voyage was commenced at night, and there was nothing to show to the master of the tug that the barge was unseaworthy, and nothing in the weather to excite apprehension of danger in proceeding to sea. *Held*, that the tug was not concurrently culpable in commencing the voyage. The William Murtaugh, 3 Fed. Rep. 404, distinguished.

Appeal from the District Court of the United States for the Northern District of Florida.

In Admiralty. Libel by the Export Coal Company against the steam tug W. J. Keyser and against W. S. Keyser and M. J. Fauria, claimants. Decree for claimants. Libelant appeals. Affirmed.

W. A. Blount, (Blount & Blount, on the brief,) for appellant.

John C. Avery and Richard L. Campbell, for appellees.

Before PARDEE and McCORMICK, Circuit Judges, and TOULMIN, District Judge.

TOULMIN, District Judge. The libel in this case was filed to recover the value of a barge, with her cargo of coal, which respondents, as owner and master of the steam tug W. J. Keyser, contracted and undertook to tow from Pensacola, Fla., to Galveston, Tex. After about 36 hours out from Pensacola, the barge was abandoned on the Gulf of Mexico, and the barge and cargo became a total loss. The libel charges that the loss was on account of the negligence and fault of the master of the tug. The answer of respondents denies negligence, and the case turns on this issue. While there are many specifications of negligence alleged in the libel, our attention is directed to only two points upon which the appellant insists there was fault on the part of the tug. These are:

"(1) That the tug abandoned the tow without reason, and is liable for its loss. (2) That, if not, the tug and the tow were both at fault, because the tow was permitted to go to sea, upon a voyage known to be probably tempestuous at that season of the year, with open places upon her deck, apparent to every one, through which it was obvious water would pour in case of seas breaking over her, and that, therefore, the tug should bear half the loss."

The barge was a registered vessel, with a crew consisting of a master and engineer and three other men, with engine, boiler, pumps, sails, and anchors, but no motive power. There was an open space in the deck, around the boiler and smokestack, of about 3 by 4 feet, and another open space in the deck of about 9 by 10 feet. Both these openings had combings of about 2½ feet high. There were hatch covers and tarpaulins on board for the openings. They were not used on the trip, but the spaces continued open until the

abandonment of the barge. The hawse pipes were 7 inches in diameter, and from $1\frac{1}{2}$ to 2 feet below decks, and were open.

As shown by the weight of the evidence, the circumstances of the voyage, and under which the barge was lost, are that the tug and tow left Pensacola about 4 o'clock on Sunday morning, November 7, 1891. The weather was cloudy, with southeast wind. On the evening of that day there was a fresh gale from the southeast, which continued until next morning, when the wind increased in force, and to a velocity of about 30 miles an hour, with an increased sea, until about noon, when the barge was deserted by her crew. The master of the tug had observed during the forenoon that the barge was shipping a great deal of water over her bow, and ordered the boats slowed down, and a slight deviation in their course, which he considered was for the benefit of the barge, and a better protection of her from the sea. It was about noon on that day, when 30 or 35 miles from South Pass, and about the same distance from the nearest point of land, the master and crew of the barge, having given a signal of distress, lowered a small boat into the sea, put their baggage into it, and got in themselves. The master of the tug, seeing them, had the tow line connecting the tug and the barge cut, and proceeded to the rescue of the men in the small boat. He states that he had the line cut that he might more readily handle the tug, as he at the time believed the men were in danger of losing their lives. When the men got aboard the tug they represented that the barge was in a sinking condition, and was leaking badly; that they were unable to use the pumps, because the water had put the fire out; and declared their unwillingness to return to the barge. The proof shows that there was at that time 4 feet of water in the hold, and that the barge was taking water very fast; that the water was going in through the openings in the deck, and through the hawse pipes. Some of the crew of the barge stated that they could not stay any longer on her, as she was leaking too badly and was going down; that the water was over the cabin floor, and had put the fire out in the donkey room; and that they abandoned her because their lives were in danger. The weight of evidence, clearly, was that the barge was in a sinking condition, and would probably go down in a few hours, and was then, as expressed by one of the witnesses, "settling by the head." The tug stayed by an hour or two, but made no effort to regain or save the barge. The master of the tug claims that any effort to save her would have been hopeless; that the master of the barge concurred in this opinion, and suggested to him to leave her, and return to Pensacola. There was some conflict in the evidence as to whether it was necessary to cut the hawser to rescue the men in the small boat, and also whether the master of the barge advised that nothing could be done to save her, and that the tug should return to Pensacola. But there was no conflict as to the condition of the barge at the time, and that her master and crew were unwilling to go back on her; and a preponderance of evidence shows that it was impracticable to have successfully towed the barge without a crew aboard of her, especially without some person at

her wheel to steer her. We think the quitting of the barge by her master and crew, without the intention of returning, severed the legal relations created by the contract of towage between her and the tug, and that any service thereafter rendered the barge by the tug would have been in the nature of salvage service. 2 Pritch. Adm. Dig. 1881, and note. In every contract of towage there is implied an engagement that each party, their agents and servants, will perform his duty in completing the contract; that proper skill and diligence will be used on board both the vessel towed and the tug; and that neither, by negligence or by mismanagement, will unnecessarily imperil the other, or increase any risk incidental to the service undertaken. News. Salv. p. 136; Macl. Shipp. p. 293; The Julia, 14 Moore, P. C. 210; The Express, 3 Cliff. 462. Tugs, when taking other vessels in tow, are bound to use ordinary care and diligence in taking up and managing the tow according to the exigencies of the business. They have the full government and care of the vessel towed. The Quickstep, 9 Wall. 670. They cannot abandon the safety of interests intrusted to them for slight causes, or on account of even ordinary obstacles, and excuse themselves. The causes must be ample, and the obstacles in the way of performance must be at least of an extraordinary character, if not absolutely insurmountable. The Clematis, 1 Brown, Adm. 499. But the law does not imply a warranty that the tug will tow the vessel to her destination at all hazards, but merely an engagement on the part of the tug to use competent skill, and best endeavors, to perform the service. She is relieved from her obligation if she be prevented by accident or circumstances of difficulty, not contemplated, which render performance of her contract impossible. Macl. Shipp. 293, 294.

It is further contended that, if the tug was not wholly responsible for the tow, she was culpable, concurrently with the libelant, in taking the barge to sea with open spaces on her deck, when heavy weather was to be expected. It has been repeatedly held that where a tug undertakes the towage of a boat known to both the owner of the tow and the tug to be unfit and unseaworthy for the voyage contemplated, and a loss occurs in the ordinary contingencies of the voyage, to which the unfitness and unseaworthiness contribute, both should be held in fault. Connolly v. Ross, 11 Fed. Rep. 342; The Bordentown, 16 Fed. Rep. 273. Proctors for appellant invoke this principle, and cite the case of The Wm. Murtaugh, 3 Fed. Rep. 404, to sustain their contention here. In that case it was held that, by reason of open hatches and other openings in the deck of the barge in tow,—which was loaded with coal,—she was unfit and unseaworthy for a trip across the bay of New York, in the state of the wind and tide then existing; that the unfitness and unseaworthiness were perfectly obvious and presumably known both to the owner of the tow and tug; and that it was negligence to undertake the trip in the weather then existing. There is a want of analogy, in some material respects, between the case cited and this case. In this case the voyage was commenced at night. The barge was not known by the master of the tug to be in an unsea-

worthy and unfit condition. The openings in the deck were covered by loose planks. There were hatch covers and tarpaulins aboard the barge to cover the openings, and there was nothing unusual in the weather. It was cloudy, with a southeast wind, but with no special indications at the time of tempestuous weather, or of anything to excite apprehension for the safety of the tow in the contemplated voyage.

We find no error in the decree of the district court, and it is affirmed, with costs to the appellees.