## THE MIRANDA.

### THE JOGGINS RAFT.

### LEARY *v.* THE MIRANDA.

### NEW YORK, N. F. & H. S. S. Co., Limited, *v.* LEARY.

(*Circuit Court, E. D. New York.* June 26, 1890.)

TOWAGE—RAFT—CONTRACT—STORM—NEGLIGENCE.

The owner of the steamer Miranda contracted, by a written charter-party, to tow a large raft of logs by sea from Port Joggins, Nova Scotia, to New York. The tow left Port Joggins on the 6th of December, 1887. On the 18th, in the midst of a heavy gale, the towing hawsers parted. The steamer lay by the raft for a time, and then started for New York, arriving there on the 22d. The raft became a total loss. Suit was brought to recover for the loss of the raft, and a cross-action to recover the towage money under the contract. The raft-owner claimed various faults in the Miranda: (1) That the original contract had been modified by an agreement that the raft should be towed to Eastport for orders, and not directly to New York, which modification had been violated. *Held,* that such agreement was not proved. (2) That the tow was taken to sea against the protest of a representative of the raft-owner aboard the Miranda. *Held,* that the charter-party contained no provision which gave any one power to direct the master of the Miranda where to go, and, on the evidence, the master committed no breach of duty in going as he did, for at the time he made such determination the weather was fine and the danger of a voyage to New York was not so obvious as to make the attempt negligence. (3) That the contract was violated when the master determined to go outside Nantucket shoals, instead of through Vineyard sound. *Held* that, under the then known facts of the availability of Vineyard sound for the passage of such a tow, it was no breach of the master's duty to omit to go through that sound. (4) That the master's failure to keep near ports of safety caused the loss. *Held* that, under the condition of weather which existed when the master determined to go outside, such failure was no breach of duty. (5) That the Miranda had insufficient hawsers and stores. *Held,* that such insufficiency was not proved. (6) That there was fault in not sooner sending the Miranda out again to look for the raft after arrival of the steamer at New York. *Held,* that this was no fault, as by the time the steamer's necessary repairs were finished it had become evident that further search was useless. The libel for the loss of the raft was therefore dismissed, and the cross-libel for the towage money sustained. Affirming 40 Fed. Rep. 533.

In Admiralty. On appeal from district court. See 40 Fed. Rep. 533.

Action by Leary, owner of a raft known as the "Joggins Raft," against the steamer Miranda for negligence in towage, resulting in the loss of the raft. Cross-action by the owner of the Miranda for towage money.

On appeal to the circuit court in the case of *Leary* v. *The Miranda,* the findings of the circuit justice were as follows:

"In this case I find the following facts:

"*First.* During the spring, summer, and autumn of 1887, a log raft was constructed at Port Joggins, Nova Scotia, on the shore of the Bay of Fundy, for the libelant, James D. Leary, under the superintendence of one Robertson, who had an interest in the profits of the enterprise. The raft consisted of 21,000 round timbers ranging from 10 to 30 inches in diameter and from 35 to 70 feet in length, and contained in all 3,000,000 feet of timber. It weighed 6,500 tons. It was 525 feet long, about 33 feet high and 50 feet beam, tapering to a diameter of 15 feet at each end. The raft was built in a cradle on the shore under a patent owned by Robertson, and was designed to be towed to New York and there to be broken up, as an economical method of transporting the timber of which it was constructed. Through the center length of the raft was a chain, from which at stated intervals smaller chains radiated to the circumference, and at the circumference each set of radiating chains was bound together by another chain encircling the raft. These sets of radiating chains were about 15 feet apart. The design was that the raft should be towed by the center chain. Any strain put upon the center chain, either at the forward end or the after end, was transmitted through the radiating chains to the outside chains, and so served to bind the raft together. The heavier the strain upon the center chain, the more closely bound was the raft.

"*Second.* The Miranda is an iron steamer of a registered tonnage of 734 tons, her length is 220 feet, her beam 32 feet, her depth 24 feet. She was built in England in 1884, and thereafter was maintained as a freight and passenger steamer between New York, Newfoundland, and Nova Scotia. Her agents in New York were Bowring & Archibald.

"*Third.* The raft was launched on the 15th of November, 1887. On the 9th of November, the libelant applied, through a broker, to Bowring & Archibald, to consider a proposition for towing the raft from Two Rivers or St. Johns, New Brunswick, to New York, and after that date there was some negotiation between the libelant and Messrs. Bowring & Archibald, looking to the employment of the steamer Miranda, then at Halifax, for the service, in the event of the proposed launch being a success. These negotiations failed, and, after the launching of the raft, and on the 16th of November, 1887, a charter-party was made in the terms following, to-wit:

" 'This contract made the 16th day of Nov., 1887, between Bowring & Archibald, agts. of the Br. str. Miranda, of 734 tons reg., and J. D. Leary, of N. Y., owner or agent of the log raft recently launched in Nova Scotia, witnesseth, that the said Bowring & Archibald hereby agree to charter the said str. Miranda to tow said log raft from St. Johns, N. B., or other safe port in N. B. or Nova Scotia where the str. can always lie afloat, to the port of New York, on the following terms and conditions: That the said J. D. Leary shall pay to the said Bowring & Archibald for the use of the str. Miranda the sum of three thousand dollars ($3,000) U. S. currency for towage of said log raft from said safe port in N. B. or N. S. to the port of New York, payable in New York on delivery of said log raft. Should the log raft get adrift, str. Miranda to search for raft until she finds her and again takes her in tow, or until she is ordered to desist by charterers' representatives on board said str., or, in the event of no such representative being on board, until the captain thinks it advisable to desist. In case the steamer finds the raft, the str. is to be paid at the rate of three hundred dollars ($300) per day additional or proportional for any part of a day while searching. Should raft be lost, str. shall not receive amount named for towage, but shall be paid at the rate of three hundred dollars ($300) per day for each day, and proportionally for every part of a day, from the time she leaves said port in N. B. or N. S. as above, until she arrives at New York. It is agreed that charterer may have

a representative on board said str., whose passage will be free, and the officers and crew shall render all the assistance and facilities that may be required for the safety of the said log raft. Steamer to pay all her own port charges, and to provide towing lines only. Demurrage, two hundred and fifty dollars ($250) per day, should steamer be detained at said port in N. B. or N. S. waiting for raft. It is understood and hereby agreed that this contract is completed on the part of Bowring & Archibald when said log raft has been delivered in any part of the port of New York. Steamer to have a lien on said log raft for towages and other services as above, and for demurrage if incurred. Penalty for non-performance of this contract, estimated amount of damages.'

"Mr. Leary was at the time absent from New York, but after his return, and before the steamer sailed from New York, the clause, ' It is agreed that charterer may have a representative on board said str., whose passage will be free,' was altered to read, ' It is agreed that charterer may have representatives on board said steamer, but not exceeding three, whose passage will be free.'

"*Fourth.* At the time the charter was made the Miranda was on a voyage from Halifax to New York. She arrived in New York on the 21st of November, and at once commenced taking on board special equipment for the towing of the raft. This equipment was furnished by Bowring & Archibald upon consultation with Leary and one Littlefield, who was introduced to Bowring & Archibald by Leary as his representative who would accompany the raft. Later, upon Leary's suggestion that he might desire to have one or two men accompany Littlefield, the charter was modified as above noted. Bowring & Archibald complied in all particulars with the suggestions made by Leary and Littlefield. The equipment for towing consisted of a 14-inch manilla hawser, 200 fathoms long, not entirely new; a 10-inch manilla hawser, 1,000 feet long, which was new; a 5-inch wire hawser, 450 feet long,—all of which were procured by hire from the Merritt Wrecking Company; a new 10-inch manilla hawser, 600 feet long, purchased by Bowring & Archibald in New York; the ship's 9-inch manilla hawser, 540 feet long, which had never before been used; and the ship's $3\frac{1}{4}$-inch wire hawser, which had never before been used. Besides these, there was a supply of shackles and chains, selected by Littlefield at the expense of the ship. The size and number of hawsers was far in excess of that originally proposed by Leary, and every requirement or suggestion made by him in respect to increasing the equipment was accepted by Bowring & Archibald. The steamer's equipment was complete and sufficient.

"*Fifth.* Littlefield had been a ship-master, and had superintended other towing operations for Leary. Littlefield proposed that the towing should be done by three hawsers, one running from a bridle over the stern of the Miranda to the forward end of the raft, and one running from each quarter of the Miranda to the sides of the raft. With this system of towing in view, certain timbers were taken on board at New York to strengthen the after-chocks of the steamer. It was arranged that the steamer should proceed from New York to the Bay of Fundy in ballast, but, upon Leary's suggestion that she would not tow well unless she was fully three-quarters loaded, it was arranged that she should there take cargo or ballast, to give her the requisite stability for towing, before proceeding to the raft. To that end a charter was made with King & Co. for a cargo of plaster to be taken on board at Windsor, provided the master of the Miranda should find Windsor a proper place for his vessel to enter. To provide against the contingency that the plaster charter might fail, Leary gave to Bowring & Archibald letters of introduction to Robertson and one Barnhill, requesting them to assist the master in procuring a cargo of coal or lumber, if such should be needed.

"*Sixth.* The steamer left New York in the morning of November 23d, Littlefield being on board, and, after a voyage made long by bad weather and heavy fogs, reached Hantsport in the Bay of Fundy on November 28th.   There the master found that he could not procure a cargo of plaster within a reasonable time, and, after making inquiries by telegraph for other cargo, proceeded to West Bay, Parrsboro, to take coal.   He arrived at West Bay, Wednesday, November 30th, and there took on board 450 tons of coal, which were lightered to him by the schooner Davida, there not being sufficient depth of water to permit the steamer to go up the river to the coal wharf.   The coaling was completed at midnight of Monday, December 5th.   While the steamer was lying in West Bay the master procured other timbers from shore and service from shore, to still further strengthen the stern chocks.

"*Seventh.* On Sunday, December 4th, Robertson came on board the steamer, and, upon examining the plans that had been made for towing the raft, announced that, owing to the peculiar construction of the raft, the proposed side hawsers would have an injurious effect, and would assist in tearing the raft to pieces, and that the towage must be entirely by the center chain. After some conference with Littlefield, this system of towing was adopted; and, considering the peculiar construction of the raft, it was the proper system.

"*Eighth.* The Miranda left West Bay at 1 A. M. of December 5th, and reached Port Joggins at 7 A. M.   The raft was then lying at anchor, drawing nineteen feet.   The work of getting up the raft's anchor and fastening the tow-lines occupied all of the 6th and the 7th, and was not completed until Thursday morning, December 8th.   The making fast of the raft to the steamer was done under Littlefield's and Robertson's orders and directions, the work being performed by the crew of the steamer and by men employed from the shore by Robertson.   As made up for towing, the 14-inch hawser was shackled to the forward end of the raft's center chain and carried to the port quarter of the Miranda, and thence made fast around her mainmast.   This hawser carried the weight of the raft.   The after-end of the raft's center chain was led over the top of the raft, and was shackled by means of intermediate steel hawsers and chains to the 10-inch manilla hawser which led to the Miranda's starboard quarter.   This hawser was carried slack, and was intended to take a strain only in the event of the principal hawser's breaking.   The raft had no rudder or steering apparatus, and carried no crew.   At night it carried no lights.

"*Ninth.* On the 8th of December the steamer set sail from Port Joggins with the raft in tow, and on Friday morning, December 9th, was off St. John.   At that point the hawsers fouled, and Robertson then suggested that the raft be taken into Eastport and the voyage to New York be abandoned for a time, but, after consultation with Littlefield, and on the hawsers being cleared, approved the prosecution of the voyage to New York.   The steamer continued down the Bay of Fundy, and at the close of the day, the weather being fair, her master selected the course to sea outside of Grand Manan, instead of passing between Grand Manan and the main-land.   Two days later bad weather came on, with strong winds from the southward, making a sea in which the raft labored heavily, and the raft dragged the steamer, during the continuance of this storm, ten miles back on her course.   On Monday, the 12th, the weather moderated, but on Tuesday, the 13th, there was a strong north-west wind and a high cross-sea.   On Thursday, the 15th, the weather grew heavy, and at midnight it was blowing a gale, which continued on Friday, the 16th, the steamer rolling rails under and the sea breaking over the raft.   On Friday morning, and before the height of the gale, the steamer and raft had reached a point within sixty miles of Block island, but then were driven more than eighty miles further out to sea, the steamer being

powerless to control the raft. On Saturday, the 17th, the wind moderated somewhat, and at noon the steamer resumed her course to New York; but later in the day she was struck by another gale, which, by the morning of Sunday, the 18th, had grown to a hurricane, the wind blowing at times at the rate of over seventy miles an hour. On this morning Captain Leseman, her master, was on the bridge, and the storm was at its height; the wind was from south-south-west; and the sea was running completely over the steamer and raft most of the time. About half-past seven the steamer's engines were slowed, and a few minutes later the port hawser broke. The strain then fell on the starboard hawser, and that strain tore out the bitts of the vessel, to which it was fastened, and tore away certain portions of the deck of the vessel, and the raft was free. A small portion of the starboard hawser was saved by cutting it as it was running out after the bitts were torn out. All through that day the storm continued with such severity that the steamer could not resume a course, but lay hove to. Her crew was exhausted; her hawsers were gone: her bitts and decks were torn; her mainmast was strained. It was determined by all on board the Miranda, including Robertson and Littlefield, that the steamer should go to New York. She arrived at White-stone, Long Island sound, on December 20th, and came up to New York two days later, and then underwent repairs, which occupied a week or ten days. She was not in condition to go to sea or to search for the raft until these repairs were completed, but on the 21st of December the United States government sent out their ship Enterprise, under command of Captain McCalla, to search for the raft, and to bring it into port, or to lie by the raft and warn vessels of it as an obstruction to navigation. The Enterprise sailed from Brooklyn at 6 P. M. of December 21st, went out through Long Island sound, and on the 24th of December found sufficient floating logs to assure her that the raft was broken up. On the 25th of December the steamer Missouri, bound on a voyage from Baltimore to London, fell in with a field of logs from the raft, extending as far as the eye could reach, and her course lay through this field for five miles. The libelant also sent out the steamer Morse, but she found nothing but drifting logs.

"*Tenth.* The Miranda was tight, staunch, and strong, was fully manned and equipped for the service which she undertook, and was fully provisioned. She prepared for and prosecuted the voyage with due dispatch. The service was a novel one. The enterprise on the part of the libelant was experimental and speculative, and without precedent. In performing the service the master of the Miranda exercised his best judgment, and he, with his officers and crew, were at all times diligent and attentive to the requirements of the situation.

"*Eleventh.* In taking a course to sea, on leaving the Bay of Fundy, instead of following the coast, the master of the Miranda acted upon his own best judgment, after consultation with Littlefield, who agreed with him that such was the better course; and, considering the size and weight of the raft, and its influence upon the steamer in case of storm, it was prudent and proper to proceed to sea instead of hugging the shore.

"*Twelfth.* In not going through Vineyard sound with the raft the master acted upon his own best judgment, formed after consultation with Leary and Littlefield and Bowring, in New York, before leaving for Nova Scotia, all of whom agreed with him. And, considering the draught of the raft, its weight, and the fact that it carried no lights, and the prevalence of fog in Vineyard sound, it would not have been prudent or proper to attempt to take the raft through those narrow waters.

"*Thirteenth.* The raft was lost through the perils of the sea and the inherent difficulties of the enterprise, and without any fault or negligence or omission on the part of the claimant in the performance of its duties.

"On the foregoing facts I find the following conclusions of law:

"*First.* The libelant, having failed to prove that the loss of the raft was the direct and natural result of any want of reasonable care and skill on the part of the Miranda, is not entitled to recover damages in this action.

"*Second.* The claimant is entitled to a decree of this court dismissing the libel, and for its costs in the district court taxed at $814.72, and for its costs in this court, to be taxed."

On appeal to the circuit court in the case of *New York, N. F. & H. S. S. Co., Limited,* v. *Leary* the findings of the circuit justice were as follows:

"In this case I find the following facts:

"*First.* During the spring, summer, and autumn of 1887, a log raft was constructed at Port Joggins, Nova Scotia, on the shore of the Bay of Fundy, for the appellant, James D. Leary, under the superintendence of one Robertson, who had an interest in the profits of the enterprise. The raft consisted of 21,000 round timbers ranging from 10 to 30 inches in diameter and from 35 to 70 feet in length, and contained in all 3,000,000 feet of timber. It weighed 6,500 tons. It was 525 feet long, about 33 feet high, and 50 feet beam, tapering to a diameter of 15 feet at each end. The raft was built in a cradle on the shore under a patent owned by Robertson, and was designed to be towed to New York and there to be broken up, as an economical method of transporting the timber of which it was constructed. Through the center length of the raft was a chain, from which at stated intervals smaller chains radiated to the circumference, and at the circumference each set of radiating chains was bound together by another chain encircling the raft. These sets of radiating chains were about 15 feet apart. The design was that the raft should be towed by the center chain. Any strain put upon the center chain, either at the forward end or the after end, was transmitted through the radiating chains to the outside chains, and so served to bind the raft together. The heavier the strain upon the center chain, the more closely bound was the raft.

"*Second.* The Miranda is an iron steamer of a registered tonnage of 734 tons; her length is 220 feet, her beam 32 feet, her depth 24 feet. She was built in England in 1884, and thereafter was owned and maintained as a freight and passenger steamer between New York, Newfoundland, and Nova Scotia by the libelant, a British corporation duly authorized to carry on such business. Her agents in New York were Bowring & Archibald.

"*Third.* The raft was launched on the 15th of November, 1887. On the 9th of November the appellant applied through a broker to Bowring & Archibald, to consider a proposition for towing the raft from Two Rivers or St. Johns, New Brunswick, to New York, and after that date there was some negotiation between Leary and Bowring & Archibald looking to the employment of the steamer Miranda, then at Halifax, for the service, in the event of the proposed launch being a success. These negotiations failed, and after the launching of the raft, and on the 16th of November, 1887, a charter-party was made in the terms following, to-wit:

"'This contract made the 16th day of Nov., 1887, between Bowring & Archibald, agts. of the Br. str. Miranda, of 734 tons reg., and J. D. Leary, of N. Y., owner or agent of the log raft recently launched in Nova Scotia, witnesseth, that the said Bowring & Archibald hereby agree to charter the said str. Miranda to tow said log raft from St. Johns, N. B., or other safe port in N. B. or Nova Scotia where the str. can always lie afloat, to the port of New York, on the following terms and conditions: That the said J. D. Leary shall pay to the said Bowring & Archibald for the use of the str. Miranda the sum of three thousand dollars ($3,000) U. S. currency for towage of said log raft from said safe port in N. B. or N. S. to the port of New York, payable in New York on delivery of said log raft. Should the log raft get adrift, str.

Miranda to search for raft until she finds her and again takes her in tow, or until she is ordered to desist by charterers' representatives on board said str., or in the event of no such representative being on board, until the captain thinks it advisable to desist. In case the steamer finds the raft the str. is to be paid at the rate of three hundred dollars ($300) per day additional or proportional for any part of a day while searching. Should raft be lost, str. shall not receive amount named for towage, but shall be paid at the rate of three hundred dollars ($300) per day for each day, and proportionally for every part of a day, from the time she leaves said port in N. B. or N. S. as above, until she arrives at New York. It is agreed that charterer may have a representative on board said str., whose passage will be free, and the officers and crew shall render all the assistance and facilities that may be required for the safety of the said log raft. Steamer to pay all her own port charges, and to provide towing lines only. Demurrage, two hundred and fifty dollars ($250) per day, should steamer be detained at said port in N. B. or N. S. waiting for raft. It is understood and hereby agreed that this contract is completed on the part of Bowring & Archibald, when said log raft has been delivered in any part of the port of New York. Steamer to have a lien on said log raft for towages and other services as above, and for demurrage if incurred. Penalty for non-performance of this contract, estimated amount of damages.'

"Leary was at the time absent from New York, but after his return, and before the steamer sailed from New York, the clause, 'It is agreed that charterer may have a representative on board said str., whose passage will be free,' was altered to read, 'It is agreed that charterer may have representatives on board said steamer, but not exceeding three, whose passage will be free.'

"*Fourth.* At the time the charter was made the Miranda was on a voyage from Halifax to New York. She arrived in New York on the 21st of November, and at once commenced taking on board special equipment for the towing of the raft. This equipment was furnished by Bowring & Archibald upon consultation with Leary and one Littlefield, who was introduced to Bowring & Archibald by Leary as his representative who would accompany the raft. Later, upon Leary's suggestion that he might desire to have one or two men accompany Littlefield, the charter was modified as above noted. Bowring & Archibald complied in all particulars with the suggestions made by Leary and Littlefield. The equipment for towing consisted of a 14-inch manilla hawser, 200 fathoms long, not entirely new; a 10-inch manilla hawser, 1,000 feet long, which was new; a 5-inch wire hawser, 450 feet long,—all of which were procured by hire from the Merritt Wrecking Company; a new 10-inch manilla hawser, 600 feet long, purchased by Bowring & Archibald in New York; the ship's 9-inch manilla hawser, 540 feet long, which had never before been used; and the ship's $3\frac{1}{4}$-inch wire hawser, which had never before been used. Besides these there was a supply of shackles and chains, selected by Littlefield at the expense of the ship. The size and number of hawsers was far in excess of that originally proposed by Leary, and every requirement or suggestion made by him in respect to increasing the equipment was accepted by Bowring & Archibald. The steamer's equipment was complete and sufficient.

"*Fifth.* Littlefield had been a ship-master, and had superintended other towing operations for Leary. Littlefield proposed that the towing should be done by three hawsers, one running from a bridle over the stern of the Miranda to the forward end of the raft, and one running from each quarter of the Miranda to the sides of the raft. With this system of towing in view, certain timbers were taken on board at New York to strengthen the after-chocks of the steamer. It was arranged that the steamer should proceed from New York to the Bay of Fundy in ballast, but, upon Leary's suggestion that she would not tow well unless she was fully three-quarters loaded, it was

arranged that she should there take cargo or ballast, to give her the requisite stability for towing, before proceeding to the raft. To that end a charter was made with King & Co. for a cargo of plaster to be taken on board at Windsor, provided the master of the Miranda should find Windsor a proper place for his vessel to enter. To provide against the contingency that the plaster charter might fail, Leary gave to Bowring & Archibald letters of introduction to Robertson and one Barnhill, requesting them to assist the master in procuring a cargo of coal or lumber, if such should be needed.

"*Sixth.* The steamer left New York in the morning of November 23d, Littlefield being on board, and, after a voyage made long by bad weather and heavy fogs, reached Hantsport in the Bay of Fundy on November 28th. There the master found that he could not procure a cargo of plaster within a reasonable time, and, after making inquiries by telegraph for other cargo, proceeded to West Bay, Parrsboro, to take coal. He arrived at West Bay, Wednesday, November 30th, and there took on board 450 tons of coal, which were lightered to him by the schooner Davida, there not being sufficient depth of water to permit the steamer to go up the river to the coal wharf. The coaling was completed at midnight of Monday, December 5th. While the steamer was lying in West Bay the master procured other timbers from shore and service from shore, to still further strengthen the stern chocks.

"*Seventh.* On Sunday, December 4th, Robertson came on board the steamer, and, upon examining the plans that had been made for towing the raft, announced that, owing to the peculiar construction of the raft, the proposed side hawsers would have an injurious effect, and would assist in tearing the raft to pieces, and that the towage must be entirely by the center chain. After some conference with Littlefield, this system of towing was adopted; and, considering the peculiar construction of the raft, it was the proper system.

"*Eighth.* The Miranda left West Bay at 1 A. M. of December 5th, and reached Port Joggins at 7 A. M. The raft was then lying at anchor, drawing nineteen feet. The work of getting up the raft's anchor and fastening the tow lines occupied all of the 6th and 7th, and was not completed until Thursday morning, December 8th. The making fast of the raft to the steamer was done under Littlefield's and Robertson's orders and directions, the work being performed by the crew of the steamer and by men employed from the shore by Robertson. As made up for towing, the 14-inch hawser was shackled to the forward end of the raft's center chain and carried to the port quarter of the Miranda and thence made fast round her mainmast. This hawser carried the weight of the raft. The after-end of the raft's center chain was led over the top of the raft, and was shackled by means of intermediate steel hawsers and chains to the 10-inch manilla hawser which led to the Miranda's starboard quarter. This hawser was carried slack, and was intended to take a strain only in the event of the principal hawser's breaking. The raft had no rudder or steering apparatus, and carried no crew. At night it carried no lights.

"*Ninth.* On the 8th of December the steamer set sail from Port Joggins with the raft in tow, and on Friday morning, December 9th, was off St. John. At that point the hawsers fouled, and Robertson then suggested that the raft be taken into Eastport and the voyage to New York be abandoned for a time, but, after consultation with Littlefield, and on the hawsers being cleared, approved the prosecution of the voyage to New York. The steamer continued down the Bay of Fundy, and at the close of the day, the weather being fair, her master selected the course to sea outside of Grand Manan, instead of passing between Grand Manan and the main-land. Two days later bad weather came on, with strong winds from the southward, making a sea in which the raft labored heavily, and the raft dragged the steamer, during the continuance of this storm, ten miles back on her course. On Monday, the 12th, the weather moderated, but on Tuesday, the 13th, there was a strong

north-west wind and a high cross-sea. On Thursday, the 15th, the weather grew heavy, and at midnight it was blowing a gale, which continued on Friday, the 16th, the steamer rolling rails under and the sea breaking over the raft. On Friday morning, and before the height of the gale, the steamer and raft had reached a point within sixty miles of Block island, but then were driven more than eighty miles further out to sea, the steamer being powerless to control the raft. On Saturday, the 17th, the wind moderated somewhat, and at noon the steamer resumed her course to New York; but later in the day she was struck by another gale, which, by the morning of Sunday, the 18th, had grown to a hurricane, the wind blowing at times at the rate of over seventy miles an hour. On this morning Captain Leseman, her master, was on the bridge, and the storm was at its height; the wind was from south-south-west; and the sea was running completely over the steamer and raft most of the time. About half-past seven the steamer's engines were slowed, and a few minutes later the port hawser broke. The strain then fell on the starboard hawser, and that strain tore out the bitts of the vessel, to which it was fastened, and tore away certain portions of the deck of the vessel, and the raft was free. A small portion of the starboard hawser was saved by cutting it as it was running out after the bitts were torn out. All through that day the storm continued with such severity that the steamer could not resume a course, but lay hove to. Her crew was exhausted; her hawsers were gone; her bitts and decks were torn; her mainmast was strained. It was determined by all on board the Miranda, including Robertson and Littlefield, that the steamer should go to New York. She arrived at Whitestone, Long Island sound, on December 20th, and came up to New York two days later, and then underwent repairs, which occupied a week or ten days. She was not in condition to go to sea or to search for the raft until these repairs were completed, but on the 21st of December the United States government sent out their ship Enterprise, under command of Captain McCalla, to search for the raft, and to bring it into port, or to lie by the raft and warn vessels of it as an obstruction to navigation. The Enterprise sailed from Brooklyn at 6 P. M. of December 21st, went out through Long Island sound, and on the 24th of December found sufficient floating logs to assure her that the raft was broken up. On the 25th of December the steamer Missouri, bound on a voyage from Baltimore to London, fell in with a field of logs from the raft extending as far as the eye could reach, and her course lay through this field for five miles. Leary also sent out the steamer Morse, but she found nothing but drifting logs.

"*Tenth.* The Miranda was tight, staunch, and strong, was fully manned and equipped for the service which she undertook, and was fully provisioned. She prepared for and prosecuted the voyage with due dispatch. The service was a novel one. The enterprise on the part of Leary was experimental and speculative, and without precedent. In performing the service the master of the Miranda exercised his best judgment, and he, with his officers and crew, were at all times diligent and attentive to the requirements of the situation.

"*Eleventh.* In taking a course to sea on leaving the Bay of Fundy instead of following the coast, the master of the Miranda acted upon his own best judgment, after consultation with Littlefield, who agreed with him that such was the better course; and, considering the size and weight of the raft, and its influence upon the steamer in case of storm, it was prudent and proper to proceed to sea, instead of hugging the shore.

"*Twelfth.* In not going through Vineyard sound with the raft the master acted upon his own best judgment, formed after consultation with Leary and Littlefield and Bowring, in New York, before leaving for Nova Scotia, all of whom agreed with him. And, considering the draught of the raft, its weight, and the fact that it carried no lights, and the prevalence of fog in Vineyard

sound, it would not have been prudent or proper to attempt to take the raft through those narrow waters.

"*Thirteenth.* The raft was lost through the perils of the sea and the inherent difficulties of the enterprise, and without any fault or negligence or omission on the part of the libelant in the performance of its duties.

"On the foregoing facts I find the following conclusions of law:

"*First.* The libelant, having performed its contract, is entitled to payment, under the terms of the charter, for twelve days, at $300 per day.

"*Second.* The libelant is entitled to a decree of this court, for $3,600, with interest thereon from the 27th of December, 1887, and for its costs in the district court, taxed at $98.10, and for its costs in this court, to be taxed."

*John Berry,* for James D. Leary.

*Butler, Stillman & Hubbard,* for New York, N. F. & H. S. S. Co.

BLATCHFORD, Circuit Justice. I concur entirely with the views expressed by Judge BENEDICT, the district judge, in his opinion in these cases, reported in 40 Fed. Rep. 533, and decrees will be entered in accordance with the findings which I have signed.