WILLIAMS (VAUGHAN v.). See Case No. 16,903.

WILLIAMS (VEAZIE v.). See Cases Nos. 16,906 and 16,907.

## Case No. 17,744a.

### WILLIAMS et al. v. The VIM.[1]

District Court, S. D. New York. March 19, 1879.

TOWAGE CONTRACT—EXEMPTION FROM INJURIES BY ICE—EVIDENCE.

[1. A statement made by the master of a tug in the course of a heated controversy with the master of one of his tows, as to the manner in which the tow should be made up, to the effect that "when we hook to a boat we are responsible for her, and you've got to be towed how and where we like," cannot be considered of any weight upon the question as to the existence or nonexistence of an alleged contract exempting the tug from responsibility for injury by ice.]

[2. A contract exempting a tug from responsibility for injury to her tow by ice does not relieve her from liability for damage resulting from her own negligence while towing in the ice.]

[This was a libel by Richard H. Williams and others against the steam tug Vim, to recover for the loss of a tow.]

Wm. W. Goodrich, for libelants.
R. D. Benedict, for claimants.

CHOATE, District Judge. This is a suit by the owner of the canal boat Oliver Breed and her cargo, consisting of 220 tons of coal, against the steam tug Vim to recover damages for the loss of said canal boat and cargo, while being towed by said tug from Brooklyn to Stamford, Connecticut, on the night of the 29th of January, 1877. The libel alleges a contract on the part of the tug to tow the boat and her cargo safely and carefully, in consideration of $50 to be paid therefor; that the tug took the Oliver Breed alongside on her starboard side, and also had another boat, the Daniel S. Reed, lashed to her port side, and left Brooklyn about 6 or 7 p. m.; that the tow proceeded up the Sound until about 12 or 1 o'clock, when near Execution Light it met large fields of ice; that the master of the tug was advised and requested by the masters of the two canal boats to tow them by a hawser astern, instead of alongside, and that that was the safest course, but that the master of the tug refused to do so, and continued to tow the boats alongside; that, while proceeding, the master of the Vim carelessly, and without slackening her speed, towed the Breed into and upon the corner of a large piece of ice, which broke a hole in the starboard bow of the Breed, causing her to fill and sink in a few minutes in very deep water; that the damage was occasioned without any fault or negligence on the part of the libellants, and solely by the fault of those in charge of the tug, among other things, in towing the said boat when the navigation was dangerous, and in proceeding at a high, reckless, and dangerous rate of speed in a place filled with ice, which was both large and solid, and in not avoiding the ice, and in not slowing and stopping the tug, and in not towing by a hawser astern, instead of alongside, and in taking the course she did, instead of some other course.

The answer of the claimants, the owners of the Vim, admit the taking of the Breed in tow, as alleged in the libel, avers that, when they made the agreement to tow said boat to Stamford, it was agreed between them and the libellants that the claimants were not to be responsible for any dangers that might happen to her from coming in contact with ice while being so towed, and in all other respects it admits the claimants agreed to tow her safely and carefully; that when the tug with her tow had arrived about opposite College Point in the East river they met with floating ice; that the master of the tug then informed the master of the canal boat that he must take the risk of proceeding on through the ice; that the master of the canal boat preferred to go on and take the risk of injury by the ice, and the tug proceeded at a very slow rate of speed with her tow through the floating ice; that libellants' boat was properly and carefully towed in all respects; that when about three miles east of Sands Point the Breed was cut into by a cake of floating ice, and there sunk.

The answer denies that the tug towed the canal boat into and upon the corner of a large piece of ice carelessly, and without slacking her speed, and avers that she was making very little headway at the time, and was not going over a mile or a mile and a half an hour. It denied the alleged request of the master of the canal boat to tow her astern by a hawser, instead of alongside, or that that was the safest course, and it denies all the allegations of negligence mentioned in the libel.

As regards the agreement between the parties, Hanchet, the master of the Breed, who is the husband of her owner, one of the libellants, testifies that he went with the master of the other canal boat, on the day they were taken in tow, to the office of what is known as the "Game Cock Line," which is also the office of the steam tug Vim, and there saw Mr. McWilliams, who was the general superintendent of the Vim, and he referred him to Mr. Gladwich, the vice-president, and that he made the agreement with Mr. Gladwich for towing the two canal boats to Stamford for

1 [Not previously reported.]

$100; that he saw McWilliams downstairs, and was sent upstairs to see Gladwich; that nothing whatever was said about ice, or who should take the risk of the ice. Root, the master of the Reed testified that he went with Hanchet to the office, and stood by him when he made the bargain; that they saw, first an old gentleman, and then another man; that nothing was said about ice; that he took no part in the conversation. This witness remembers very little of the conversation. He does not remember their going upstairs at all. The testimony of McWilliams and Gladwich and of Coffin, the secretary of the company, shows clearly, I think, that the interview of these two captains on that day was not with Gladwich, but with somebody else, and that they left the order for the towing of the boats with a boy named Duke, who kept a slate in the lower office, on which all orders for the Vim were entered by him; that the Game Cock Line took no orders for towing to Stamford, nor east of Norwalk, and that this order was entirely out of the line of the business of McWilliams and Gladwich. Upon this evidence, the witness Hanchet being so entirely wrong as to the circumstances of the interview, either from failure of memory or other cause, I cannot attach much weight to his statement as to the terms of the contract, if the contract was then made. It appears from the testimony of one of the witnesses from the office that the subject of the towing of these two boats had been talked of, and somebody had been there several times before to negotiate for the towage, though both the captains deny that they ever went there before, or authorized anybody to go there for them. The proof seems to be that no order for the towing of these boats was entered on the slate kept by Duke till that day, although the captain of the tug is positive in his recollection that he had received the order three or four days from Duke, and that he was waiting for the ice to clear away before starting. It is probable that he has confounded in his recollection the talk about the matter in the office and his consequent expectation of taking the boats to Stamford with the actual receipt of an order, and that he is mistaken on this point. Duke, with whom, upon the testimony, the contract was probably made, was not called; and although it appeared that he had removed to the state of Kansas some months before the trial, the fact that he was not examined is a circumstance to be considered on this question of what, if any, agreement was made as to ice. It appeared that at the very time the contract was made there was a notice written in chalk on a blackboard conspicuously placed in the office that boats towed by the company took the risk of ice. But, however probable the making of a contract exempting the tug from this risk would be under the circumstances, there is no evidence as to what took place at the time of the making of the agreement to prove that such

a contract was made. Both parties, however, rely on conversations between the master of the tug and the masters of the canal boats after the making of the agreement, and before the loss of the Breed, establishing their respective positions that this contract as to ice was or was not made between them.

Captain Brainard, the master of the tug, was a part owner of her, and had full authority to make or alter any contract on her part for towage service. The first conversation was when the tug came to take the canal boats in tow. There was some trouble at first, growing out of the fact that when the master of the tug went to take the Reed in tow he was going to put her on his port side, and the captain of the Reed objected. The boats were lying at adjacent piers not far apart. The master of the tug undoubtedly insisted on his right to make up the tow as he pleased. There was loud talk between him and the captains of the canal boats before the difficulty was arranged, at the suggestion of Captain Hanchet that all that the captain of the Reed wanted was to be so placed that on arrival at Stamford the Reed should be first put up to the pier. Then Captain Brainard said he could arrange that by shifting the boats when he got to Stamford. But in the course of this altercation several witnesses testify that Brainard said something to this effect: "I want you to understand that when we hook on to a boat we are responsible for her, and you've got to be towed how and where we like." Although Captain Brainard denied having said this, or anything about being "responsible," it is of no consequence, in itself, as regards this alleged ice contract, whether he said it or not, for obviously the language, if used, did not relate to ice, or the risks of ice, but the words, if spoken at all, were spoken with reference to the question then before them; that is to say, the way in which the tow should be made up. It meant no more than this: that, as the tug undertook to do the towing, the tug should make up the tow and arrange the boats as he saw fit. Under the circumstances in which the words were used, they were not designed to define with precision the responsibility assumed by the tug, nor express the understanding of Captain Brainard in using them as to the nature and limits of the responsibility of the tug. They meant only, in a general sense, that it was the tug's business that he was doing, and that for which the tug, and not the canal boats, were responsible, and therefore that he must control it. A very true and proper statement of the case, but having no tendency to show whether the parties had or had not entered into an agreement exempting the tug in any degree from the risks of ice. I think the evidence sufficient to show that something of the kind was said. The fact that Captain Brainard denies the use of this expression is of no importance, except as bearing on the question of the credi-

bility of the two witnesses Brainard and Hanchet, on which, to a great extent, the case, in its more important points, must turn. It is, however, obvious that this denial may easily have been the result of failure of memory on his part, if the words were in fact spoken. In such a conversation, which was noisy and excited, and lasted some time, no witness can be expected to recollect all that was said. The other conversation is far more important, and has a direct bearing on the terms of the agreement with respect to ice. It will be remembered that Captain Brainard did not make the contract. It was made at the office. He received the order from Duke, and came for the boats. After they got under way, the three captains and the steward of the Vim went into the cabin of the Breed, and played a game of cards. The engineer of the Vim was there also, but not playing. After playing a while, there was a bell from the Vim to slow. Captain Brainard jumped up, and went and looked out. They had come to ice. This was about off White Stone Point. The captain of the Vim testified that he then said to the captains of the two canal boats: "Gentlemen we have come to ice. We take no risk of accident in ice. If you don't take the risk of ice on these boats, I am not going any further with them;" that the captain of the Breed spoke up, and said: "We all understand that; go ahead." With some unimportant variation in the language, this conversation is also testified to by the engineer and the steward of the Vim. Captain Hanchet admits the remark of Captain Brainard to have been made substantially as he states it, except as to not going further, but he says that he did not answer: "We understand that; go ahead"; but that he said: "If you wanted that, you should have told us before we left New York, and allowed us to make our choice." Captain Root of the Reed, the other witness, testifies that when Captain Brainard said "I suppose you know that you are towing at your own risk in the ice," he replied that he couldn't see it, and that Hanchet said the same as he did, "that he couldn't stand that going on his own risk"; that the words used by Hanchet, which he could not recall exactly, meant the same as what he had himself said. The three witnesses from the tug deny any such reply by Root and Hanchet, or any reply by Root, and Hanchet swears that he doesn't remember saying "that he couldn't see it." It is, of course, difficult, if not impossible, to reconcile this testimony on any theory of mere mistake or misrecollection, and, taking into consideration the other parts of the evidence, which is full of contradictory testimony between these two principal witnesses Brainard and Hanchet, and also considering the probabilities of the truth of the one statement and the other, so far as the circumstances under which the conversation took place throw light upon it, and the fact that they actually went on their voyage,

I think the preponderance of the evidence is decidedly in favor of Captain Brainard's statement of what took place, and that Captain Hanchet admitted that he understood that the boats took the risks of accidents from ice, and that such was either the original agreement, or was then and there admitted by Hanchet to be his understanding of the agreement. This question is, however, mainly important as testing the relative credibility of the witnesses, because no such agreement as is here shown would relieve the tug from damage which was caused by her own carelessness or negligence while towing in the ice; and the more dangerous the position of the tow was in the ice, the greater the degree of vigilance and care which the law exacts of those in command of her, as that measure of ordinary care which a prudent owner would take in respect to his own property.

The question of negligence then remains unaffected, or but slightly affected, by this ice contract. That the Breed was cut into at the bow by the ice, and that this was the cause of her sinking, admits of no doubt. That the tow, in its further progress towards the eastward, fell in with dangerous ice floating in more or less large fields on the Sound is clearly proved; that this ice was much of it heavy, some of it eight to ten inches, at least, in thickness, is also proved. The tug had the flood tide with her till she reached Throg's Neck, and from there to Execution Light she had the flood against her, and from Execution Light to the eastward she had the ebb, which was there with her. They first met heavy ice that was troublesome after passing Execution Light. Another tug, the Uncle Abe, passed them about this point, with her tow alongside, and, coming up to this ice, signaled the boats astern, and went on. I think the evidence is that they passed Execution Light about midnight; that, after passing that point, their course was circuitous, and their progress very slow; that they deviated from their course to avoid and go round ice, and several times stopped. About 1 o'clock the Reed broke away, one or more of the lines between her and the tug gave way as they went through the ice, but she sustained no injury. They stopped, secured the Reed, and went on. It is evident that a considerable time elapsed between this breaking away of the Reed and the sinking of the Breed. Captain Brainard testifies that it was about four o'clock that the Breed sank. The evidence, as a whole, I think, tends to confirm him on this point. It is impossible to fix with any accuracy the place of the disaster, except that it was somewhere between Execution Light and Captain's Island, and not less than three miles from Execution. Captain Brainard's estimate of three miles east of Execution seems too short a distance, considering the length of time after passing that point. But the place is not material, except as the testi-

mony in respect to the place bears on the credibility and accuracy of the witnesses. The testimony of the engineer, which seems credible, and is certainly on this point not controlled by any contradictory evidence of any weight, is that, after getting into the ice, they went all the time under a slow bell, the engine just turning over enough to keep headway on, and he strongly corroborates the testimony of Captain Brainard that, after getting into the ice, they were not going more than a mile or a mile and a half through the water. The testimony of Captain Hanchet is to the effect that the immediate cause of the injury to the Breed was that, in trying to get into a channel through the ice made by another steamer, the Tilley, Captain Brainard made for a passing nearly at right angles with his course, leading into this channel, and to get into the pass he rang up the tug, and tried to break off the corner of a large field of ice, bringing the tow up to it in such a way that the starboard bow of the Breed struck directly against this field of ice, so as to break it off. The evidence does not sustain this charge. It is highly improbable in itself as a maneuver for the master of the tug to make, and it cannot be reconciled with the testimony of the master or the engineer, and there is no evidence of any jar or concussion, or, indeed, of any such sudden injury to the Breed as such a movement would have caused. Indeed the decided weight of evidence seems to be that the immediate blow by which the Breed suffered was not noticed by any one, but that either Captain Hanchet or Captain Root observed that she was lower in the water then she had been, and then it was discovered that she had received a serious injury on the starboard bow. How she received the injury certainly is not proved. Hanchet swears that she was in good condition, and about ten years old. Certainly there is nothing proved, either in the speed of the tug, or in the way that the tow was managed while in the ice, indicating any want of proper care in her management shortly before the discovery was made which will account for the injury received. If the tug was to proceed at all through the ice, it is difficult to see how she could have proceeded more cautiously. Nor is it a case where the mere happening of the injury by ice can be taken as itself sufficient evidence of want of care. The constant presence of ice ahead and about the boats carried with it a peril to them against which the greatest care and skill on the part of the master of the tug could not with absolute certainty guard. The ice was floating and drifting with the tide and the currents, and threatened any weak point, or, indeed, any strong point, in this canal boat, independently of any power of the tug to control it. Although it was a moonlight night, the evidence is that it was very difficult to distinguish the ice from the water in many places.

Upon the whole evidence, I think the negligence charged in the libel is not established by the proofs. The expert testimony as to which is the better and safer mode of towing canal boats in the ice, alongside or astern, is conflicting and indecisive. Much it appears depends on the particular circumstances of the case in hand, and some weight must be given to the judgment formed on the spot by an experienced master. In this case it is not proved that before the accident the master of the Breed requested Captain Brainard to tow him astern, nor that, under the particular circumstances of this voyage, such mode of towing would have been safer for the canal boat.

Libel dismissed, with costs to claimants.