## THE MIRANDA.[1]

## THE JOGGINS RAFT.

## LEARY v. THE MIRANDA.

## NEW YORK, N. F. & H. S. S. Co., Limited, v. LEARY.

*(District Court, E. D. New York. November 13, 1889.)*

TOWAGE—RAFT—CONTRACT—STORM—NEGLIGENCE.

The owner of the steamer Miranda contracted to tow a large raft of logs by sea from Port Joggins, Nova Scotia, to New York. The tow left Port Joggins on the 6th of December, 1887. On the 18th, in the midst of a heavy gale, the towing hawsers parted. The steamer lay by the raft for a time, and then started for New York, arriving there on the 22d. The raft became a total loss. Suit was brought to recover for the loss of the raft, and a cross action to recover the towage money under the contract. The raft-owner claimed various faults in the Miranda: (1) That the original contract had been modified by an agreement that the raft should be towed to Eastport for orders, and not directly to New York, which modification had been violated. *Held*, that such agreement was not proved. (2) That the tow was taken to sea against the protest of a representative of the raft-owner aboard the Miranda. *Held*, that the charter-party contained no provision which gave any one power to direct the master of the Miranda where to go, and, on the evidence, the master committed no breach of duty in going as he did, for at the time he made such determination the weather was fine, and the danger of a voyage to New York was not so obvious as to make the attempt negligence. (3) That the contract was violated when the master determined to go outside Nantucket shoals, instead of through Vineyard sound. *Held* that, under the then known facts of the availability of Vineyard sound for the passage of such a tow, it was no breach of the master's duty to omit to go through that sound. (4) That the master's failure to keep near ports of safety caused the loss. *Held* that, under the condition of weather which existed when the master determined to go outside, such failure was no breach of duty. (5) That the Miranda had insufficient hawsers and stores. *Held*, that such insufficient provisioning was not proved. (6) That there was fault in not sooner sending the Miranda out again to look for the raft after arrival of the steamer at New York. *Held*, that this was no fault, as by the time the steamer's necessary repairs were finished it had become evident that further search was useless. The libel for the loss of the raft was therefore dismissed, and the cross-libel for the towage money sustained.

In Admiralty.

Action by Leary, owner of a raft known as the "Joggins Raft," against the steamer Miranda, for negligence in towage, resulting in the loss of the raft. Cross-action by the owner of the Miranda for towage money.

*John Berry*, (*F. A. Wilcox*, advocate,) for Leary.

*Butler, Stillman & Hubbard*, for the Miranda.

BENEDICT, J. These are cross-actions. The first is brought to recover damages for an alleged breach of a contract made between the libelant Leary and the owners of the steamer Miranda for the towage of a log raft from New Brunswick to New York, the raft having been lost on the voyage, and, as the libelant Leary asserts, by the fault of the steamer. The second action is brought by the owners of the Miranda against James D. Leary to recover compensation for towing the raft, demurrage, expenses, etc., according to the stipulations of the contract. The evidence shows that in the spring, summer, and autumn of 1887 a log raft

[1]Reported by Edward G. Benedict, Esq., of the New York bar.

was constructed at Port Joggins, Nova Scotia, in the Bay of Fundy, for the libelant Leary, under the superintendence of Hugh R. Robertson, who had an interest in the profits.   The raft consisted of round timbers, 10 to 30 inches in diameter, and 35 to 70 feet long, and contained in all some 3,000,000 of feet of timber.   It was 525 feet long, 32 to 33 feet high, 50 feet beam, and 15 feet in diameter at each end, being cigar-shaped.   It drew over 19 feet in the center, and weighed over 6,000 tons.   It had no rudder or steering apparatus, and was intended to be towed by means of a chain leading through 'he center of it, to which were fastened other chains, surrounding the timbers at intervals, and so arranged that the strain upon the core-chain would tighten the chains around the timbers, and so hold the raft together.

On the 16th day of November, 1887, in anticipation of the launching of the raft at Port Joggins, the contract sued on was made in New York between Leary and Bowring & Archibald, agents of the owner of the' steamer Miranda.   The charter-party provided that the steamer should tow the raft from St. Johns, or other safe port in New Brunswick or Nova Scotia, to New York for the sum of $3,000, to be paid on delivery of the raft in New York.   The contract also provided that the charterer was to have representatives on board, not exceeding three, and that the officers and crew were to render all assistance and facilities that might be required for the safety of the raft; and it further provided that should the raft get adrift the steamer should search for the raft until she found it, or until she should be ordered to desist by the charterer's representatives on board the steamer.   Considerable delay occurred in dispatching the steamer for the raft, so that it was the 6th of December when the steamer arrived at Port Joggins, where the raft lay.   On the 8th of December the steamer set sail from Port Joggins with the raft in tow.   On Friday morning, December 9th, she was off St. Johns, and at the close of the day was five or six miles from Lepreaux, on a course between Grand Manan and the main-land, the weather being fair.   At 7:30 of that day the steamer's course was altered from W. to S. by W. ½ W., and the steamer thus put on a course for New York by the open sea. On Sunday, the 11th, the weather came on thick, blowing from southward, with a nasty sea, the raft laboring and the steamer rolling.   On Monday, the 12th, the weather moderated.   On Tuesday, the 13th, there was a strong north-west wind, and high cross-sea.   On Wednesday, the 14th, the weather was fine.   On Thursday, the 15th, southerly winds, and heavy weather.   At midnight it was blowing a gale, which continued on Friday, the steamer rolling, rails under, the sea breaking over the raft.   A part of the time the steamer lay under the lee of the raft, drifting.   On Sunday, the 18th, a gale blew from the south-west, called a "severe gale" by some witnesses, and a "hurricane" by others. Up to this time the voyage had been without disaster.   The towing lines had proved sufficient, the raft had withstood the wind and the sea, and the steamer had been able to manage it.   On Sunday morning, when the gale was at its height, the raft lying in the trough of the sea, every wave breaking over it, the port hawser by which the raft was being towed

parted. Immediately afterwards the starboard hawser carried away the steamer's fore-bitts and after-bitts, and ran out, and so all connection between the raft and the steamer was severed. The steamer lay by until 5 p. m.; then she started for New York, and arrived at Whitestone December 19th, and at New York December 22d. On December 21st and December 25th the United States steamer Enterprise went in search of the raft, with hawsers for towing, and found only logs adrift, and felt assured from what was seen that the raft must have been entirely broken up. On the 25th of December the master of the steamer Missouri passed through a field of logs, stretching to the horizon, five miles wide and seven miles long. The Morse was also sent out by Leary to search for the raft, but nothing was found but some drifting logs. Thereupon, on the 21st of January, Leary filed his libel *in rem* against the Miranda, claiming damages for breach of the towing agreement.

On the part of the libelant Leary it is insisted, first, that after the arrival of the vessel at Port Joggins the towing contract was modified, by agreement between the master and Robertson, according to which the raft was to be towed from Port Joggins to Eastport, the nearest American port, some 100 miles from Port Joggins, and there await orders from the owner, instead of being towed from Port Joggins to New York, as the charter contemplated. The claimants deny that any such modification of the charter was made. Upon this issue of fact there is conflicting testimony, but, taking it altogether, in connection with the action of the parties in New York, I am unable to find that an agreement to modify the charter-party, as claimed by the libelant Leary, was concluded with the master of the steamer.

It is next contended on the part of the libelant Leary that the contract was violated when the course of the vessel was changed to go outside the Grand Manan and to sea, against the protest of Robertson. The evidence shows that at this time Robertson, who was on board the steamer as a representative of Leary, demanded of the master that he take the raft to Eastport or Machias, and protested against proceeding to sea with her. The weather was then fair, and the sea smooth, but the season was late. Robertson's protest did not rest upon any present danger to the raft, but upon the dangers he anticipated in case a voyage to New York by the steamer, with such a raft in tow, was attempted at that season of the year. Here the contention of the libelant Leary is that the charter bound the master to take the instructions of Robertson as to the steamer's movements with the raft; and when, against the instructions of Robertson, he proceeded to New York, he thereby assumed a liability for the loss of the raft. The difficulty with this contention is that the charter-party contains no provision which gave Robertson or Littlefield, or even Leary himself, power to direct the master to take the raft to Eastport or Machias. The charter-party contains no language indicating an intention to allow Leary, by his representatives on board, to direct the movements of the steamer with the raft, or to control the destination of the steamer. Robertson indeed had a letter from Leary, which he showed to the master, in which Leary says to Robertson:

"You are the sole judge of all the steamer's movements with the raft. They are to navigate her. I will see the captain to-morrow, and give him to fully understand that." But this letter, which was written several days after the execution of the charter, does not refer to any provision of the charter containing such power, and states that such power is to depend upon a subsequent understanding to be had with the master; which understanding, so far as it appears by the evidence, was never had. When, therefore, the request was made by Robertson that the vessel put into Eastport instead of going to sea, it had no legal effect upon the master's duty, and the case upon this point resolves itself into this: whether it was a breach of the master's duty to take the vessel to sea, instead of going into Eastport or Machias, at that season of the year.

Upon the evidence I cannot hold that the master committed a breach of duty when he determined not to go to Eastport, but to go to sea. At the time he made that determination the weather was fair, and the sea smooth. He had then some experience with the raft, and was justified in believing that it was a reasonable undertaking to attempt to take it to New York. This is shown by the result, for the raft was safely towed for some 10 days of stormy weather. Undoubtedly the lateness of the season increased the hazards of such a voyage, but I am unable to hold that the danger of a voyage to New York at that season of the year was so obvious as to make it a breach of duty on the part of the master to make an attempt to take the raft to New York instead of taking it to Eastport.

Again, it is contended that the contract was violated when the master determined to go outside of Nantucket shoals instead of over the shoals, and through the Vineyard sound. Upon this point the evidence for the owner of the raft is that the master of the vessel was requested by both Robertson and Littlefield to take the vessel through Vineyard sound, to which request the master replied by showing instructions from his owner forbidding him to go through Vineyard sound. But assuming, as has already been pointed out, that the charter gave neither to Robertson nor Littlefield nor Leary the power to direct the master as to the course to be pursued by the vessel in the performance of the charter, I am unable to find that it was a breach of the master's duty to omit to take the passage of Vineyard sound. The raft was a large structure, without steering power of her own, and of a weight sufficient, under some circumstances, to overcome the power of the steamer. Vineyard sound is narrow and difficult. The only raft which up to that time had been taken through it was of a different construction, containing only 5,900 sticks of timber, while Leary's contained 21,000, and the passage was made in the summer time. The fact that a raft larger than Leary's, and similar in character, has been taken through the Vineyard sound in safety since the loss of the raft in question, may lead some to believe that Leary's raft could have been taken safely through on this occasion. But no such fact was present when the master of the Miranda was called on to elect between the Vineyard sound and the outer

passage. At that time the known facts respecting the availability of the Vineyard sound for the passage of such a raft did not, in my opinion, make it the duty of the master to take Vineyard sound. In this connection it is to be noticed, and the fact is significant, that neither in the original libel nor in the various amendments since made is the omission to take a course through Vineyard sound put forth as a ground of recovery.

Again, it is insisted on behalf of the libelant Leary that the master of the steamer was guilty of a breach of duty in taking a course for New York by the open sea, instead of going near the land, where ports of safety would have been available in case of storm. But no such occasion for resort to ports of safety arose up to the time when the master determined to go outside of the shoals instead of over the shoals and through the Vineyard sound, and, if the course by the Vineyard sound had been then resorted to, the vessel would have passed Chatham in fair weather, and without occasion to resort to any port of safety. The omission to keep near ports of safety, therefore, had nothing to do with the loss of the raft.

Still further, it is urged on behalf of the libelant Leary that the loss of the raft was owing to the use of hawsers insufficient in quality, size, and length. But the fact proved, that the steamer with the hawsers employed was able to manage the raft, and tow it in safety through several storms prior to the violent gale of the 18th, makes it plain that it cannot be held that insufficient hawsers were employed to make fast to the raft.

Yet again, it is contended that the parting of the port hawser in the storm of Sunday, the 18th, arose from the fact that the hawser had been permitted to chafe in the chock to such an extent as to make it unsafe to put it further out, as was done on the 14th, without splicing. But the hawser held from the 14th to the 18th, and when it parted the severe storm was at its height. The chafing is denied by the master. I am not satisfied by the evidence that the loss of the raft can be justly attributed to an unsafe condition of the hawser, when it was put further out on the 14th, by reason of chafing.

As to the claim on behalf of the libelant Leary that the steamer was insufficiently supplied with provisions and supplies, and thereby prevented from staying to search for the raft as the contract provided, there are two answers made: *First*, that the weight of the evidence is against the assertion that the steamer was short of provisions; *second*, that the loss of hawsers, the condition of the vessel, with deck broken up and bitts torn away, and mast strained, made it impossible for the steamer to do anything more for the raft. All on board seem to have concurred in the opinion that no more could be done.

Lastly, as to the claim that a breach of contract was committed in not sending the steamer out again in search of the raft, it is sufficient to say that by the time the necessary repairs were done to the steamer it had become evident that further search was useless.

There remains but to say that I have made a careful examination of the voluminous testimony in the case, which is by no means free from

extraordinary contradictions, and that I am unable to arrive at the conclusion that the loss of the raft was caused by any neglect or want of care or skill on the part of the steamer. It follows that the libel of Leary against the steamer must be dismissed, with costs, and that in the action of the New York, Newfoundland & Halifax Steam-Ship Company, owners of the steamer, against Leary, the libelants must have a decree for the sum of $3,600, being for 12 days' service, at $300 a day, as the contract provided.

In regard to the claim for demurrage, it is disallowed, and, as at present advised, the claim for chains, etc., is also rejected; but as to this latter claim I will hear counsel further on the settlement of the decree, if they desire then to be heard.