### In re MORAN.

### ATLANTIC, GULF & PACIFIC CO. v. LUCKENBACH et al.

(District Court, E. D. New York.   January 10, 1903.)

1. TOWAGE—LIABILITY OF TUG FOR LOSS OF TOW—ABANDONMENT WITHOUT NECESSITY—LIMITATION OF LIABILITY.

By the disablement of the tug intended therefor, Luckenbach was unable to perform his engagement to tow a dredge and laden scow from Wilmington to Washington, and acting for, but not disclosing the libelant, employed the Moran Company to take the dredge, without mentioning the scow. Upon arriving at Wilmington, the master of the tug discovered, and notified the tug owner, that the scow was part of the tow, and thereupon the owner addressed the libelant, as well as Luckenbach, with the result that he undertook to tow the scow without risk and for additional compensation. Urged to haste, the tug, with the tow, started on September 13th, with such equipment as she had, without opportunity to procure more. After leaving Delaware. Breakwater the eight-inch hawser, new in the previous May, and since very much used, was employed for 16 hours, in favorable weather, save an adverse southeasterly swell, when it parted. After an hour's delay it was united to a good hawser, new in the previous July, and since savingly used, and the line thus formed was continued in propitious weather until 4 p. m. of the next day, when, near St. Charles' Light, it parted in the older hawser. A delay for an hour was followed by a readjustment of the same line, which broke about 10 p. m. in the newer part thereof, under the influence of an impeding northwest gale of about 35 miles per hour, opposing southeasterly swell, and adverse strong ebb tide. Thereupon the dredge tendered, or furnished upon request, to the master of the Moran a six-inch line of 80 fathoms, which was run from the port bitt of the dredge,

---

¶ 1. Limitation of shipowner's liability, see note to The Longfellow, 45 C. C. A. 387.

through her port chock, which soon gave way, to the tug's stern bitt, and thereby the dredge was towed cornerwise, until about 2:30 a. m.— the scow meanwhile having been cut adrift by the crew of the dredge— when the line parted, whereupon the crew of the dredge was taken off. The Moran stayed near the dredge for three-quarters of an hour, and then, leaving it in no immediate danger, went to Norfolk, 40 miles away, where she remained until 12 p. m., when she went out on a tardy and ineffectual search for the dredge. The dredge during the day of her abandonment floated along the coast in sight of land, in apparently good condition, and for several hours was seen by persons at two life-saving stations, respectively 40 and 45 miles below Cape Henry, and its wreckage came ashore 65 miles south of that point on Wednesday morning, September 19th. The scow was recovered some 50 miles down the coast by a wrecking steamer that left Norfolk at 8:40 p. m. on September 16th, and went some miles south of the place where the scow was recovered without seeing the dredge.

*Held*: (1) The tug left the dredge and went to a point 40 miles away without necessity, where she remained, without purpose or useful errand, until all chance of rescue was past, and this fault was the proximate cause of the loss of the dredge.

(2) The breaking of the new hawser was not the result of the crew's negligence, or that of the master, but arose from the impediment to towing offered by the extraordinarily adverse conditions.

(3) If the use of the older hawser was negligent, it was the sole fault of the master of the tug, to whom a sufficient hawser had been provided, but its parting was not the proximate cause of the loss of the dredge.

(4) The scow was cut loose by the crew of the dredge, and no recovery can be had therefor.

(5) The owner of the Moran is entitled to limit his liability.

(6) The respondents Messrs. Luckenbach are not liable.

(Syllabus by the Court.)

In Admiralty. Suit for loss of tow, and proceeding by owner of tug for limitation of liability.

Wing, Putnam & Burlingham and Harrington Putnam, for petitioner.

Boardman, Platt & Soley and James Russell Seley, for Atlantic, Gulf & Pacific Co.

Peter S. Carter, for the Luckenbachs.

THOMAS, District Judge. September 3, 1900, the Atlantic, Gulf & Pacific Company, claimant in the above proceedings for limitation of liability, and libelant in the above action, by Catt, its president, engaged the Messrs. Luckenbach to tow a dredge and scow, by the ocean route, from Wilmington, Del., to the mouth of the Potomac, at the agreed price of $450, with an additional $150 if delivered at Washington. September 10th, Edgar F. Luckenbach advised Catt that the tug Luckenbach, intended for the service, was disabled. Thereupon Luckenbach, in his own name and without disclosing the libelant, engaged the tug Moran, of the Moran Towing Company, to tow the dredge to Washington for $600, and he reported accordingly to Catt. Luckenbach claims that he made this contract at Catt's request, while the latter insists that it was done upon the responsibility of Luckenbach, and without notice to him that the tug Moran did not belong to the Luckenbach firm, although he admits notice of the disability of the tug Luckenbach, the request on his part that Luckenbach should find another tug, and that the latter

reported the substitution of the Moran. September 11th the tug Moran started for, and September 12th arrived at, Wilmington, where her master, Ellis, discovered that a large scow was to accompany the dredge, and reported the fact to his principal. Catt, Luckenbach, and Moran communicated, and Catt learned that Luckenbach had engaged the tug Moran to tow the dredge only. Moran insisted upon additional compensation for towing the scow without risk, and upon such terms he started the tow. At this time at least Catt knew that Moran had been employed by Luckenbach, but his negotiation for another tug at Baltimore, his conduct of the whole transaction, and the conversations, lead to the conclusion that Catt did not intend to look to Luckenbach as the principal. But the neglect of Luckenbach to advise Moran that the scow was part of the tow induced Moran to send his tug to Wilmington, expecting to tow the dredge alone, and resulted in the latter disclaiming responsibility for the scow.

Had the agreement been that the dredge and scow, one or both, were to be towed without risk on Moran's part, it would not exempt him or his tug from damages for injury caused through his own or his servant's negligence. The Syracuse, 79 U. S. 167, 171, 20 L. Ed. 382; Deems v. Canal Line, 14 Blatchf. 474, 7 Fed. Cas. 348 (No. 3,736); Vanderslice v. The Superior, 26 Fed. Cas. 970 (No. 16,843); Williams v. The Vim, 29 Fed. Cas. 1413 (No. 17,744a); The Jonty Jenks (D. C.) 54 Fed. 1021, Coxe, J., March 16, 1893. But this rule does not preclude consideration of the fact, as bearing upon the owner's privity or knowledge, that he was induced to agree to equip his tug for one burden, sent the tug to Wilmington for such service, was there without an opportunity to adjust his equipment to the superimposed duty of taking the scow, and was urged to start the tow in haste. Hence, on Thursday, September 13th, the undertaking began with towing lines that, under the conditions of weather at times ensuing, proved inadequate for the two vessels, however adequate they may have been for towing the dredge alone. The dredge was, in draft, shape, weight, and superstructure, difficult of navigation, especially in seriously disturbed waters. Her tendency was to flounder rather than to founder. The picture, which does not show the true height of her smokestack, will aid the description.

For the purposes of the voyage planking had been nailed outside of the house, so as to come within 18 inches of the top, and about one foot from the edge of the lower deck. The dredge was about 116 feet long, with 35 feet beam. Her sides were square, 9 feet deep, bottom flat, and ends nearly upright. At the working end, the part aft in towing, there was an open cut into the structure, called the ladder well, about 18 feet long and 12 feet athwart ships, the framework ladder at the outer, and carried a revolving cutter cage which could be raised or lowered by machinery. The ladder frame filled the well, and was at the outer end supported by wire tackle running over a high framework, by which it could be raised or dropped for dredging. On the tow, the ladder dragged in the water, being about two-thirds submerged. Thus ranged horizontally, the ladder projected about 22 feet from the after ends of the dredge.

The cutter cage itself was laden on the scow. In the after end of the hull, next the ladder well, was the pumproom, about 30 feet long, between two side bulkheads; then forward of a wooden cross-bulkhead was the engine room, in front of which (with no separating bulkhead) was the fireroom. Forward of the pumproom the fore and aft bulkheads were open, with the overhead deck resting on the stanchions only, supported by a keelson about 2 or 3 feet high. The boilers were 16 feet long and 14 feet high, rising 3 or 4 feet above the deck, and each had a furnace. The hull was box-shaped, and about 9 feet high. Then came a deckhouse, or machine house, 10 or 12 feet high, and some 70 feet long. This came within 4 feet of the sides of the hull. On this was a nearly square pilot house aft, and another upper house forward, with two rooms. The smoke-stack rose 60 feet above the top of the engine house, and was 64 inches in diameter, and was held in place by steel guys leading fore and aft, and by temporary rope supports at the sides. There were three anchors, one weighing 996 pounds, another 500 pounds, and another 550 pounds. She had a wire bridle for towing. The scow, which was used as a tender, was 65 feet long, 26 feet wide, and 5 or 6 feet deep, with a draft 2 feet forward and 3 feet aft. She was decked over, and carried about 30 tons of spare parts of machinery, and a crew of 2 men. She had a house seven feet high and six feet square. She was attached to the dredge by two lines, each 350 feet long, running from her forward corners. The Moran was a steel tug, built in April, 1900, 94 feet 10 inches long, with 19 feet beam and 11 feet depth of hold. She had a steel deckhouse, with a pilot house on the forward end thereof, and carried an eight or nine hundred pound anchor. Her consumption of coal was five tons in 24

hours, steaming steadily at sea. When she arrived at Norfolk, as hereinafter stated, she had 15 or 16 tons of coal in her bunkers.

With this ponderous dredge and clumsy scow, the tug made her way to Delaware Breakwater, where, on account of the weather conditions outside, she stayed until Sunday morning, September 16th, when she started down the coast. The weather and sea were favorable, save for a heavy southeasterly swell, which moderated so that the tow went well, until about 10 o'clock on Sunday evening, when, in a heavier undertow, the hawser, which ran from the stern of the tug to the steel bridle of the dredge, broke, causing an hour's delay. The hawser, which was 200 fathoms in length and about 8 inches in size, was new in the previous May, and had received such use that the tug's captain requested and received a new 7 or 7½ inch hawser in July, which had been used sparingly. After the parting of the hawser a line was made fast to the dredge, whereby she was held in position until the bridle of the dredge was drawn aboard by hand, whereupon the tug bent on both hawsers, thereby extending the scope of the line, for the purpose of easier towing, which readjustment gave some of the crew of the dredge the erroneous notion of a second parting of the line at that time. There was no further interruption until the next afternoon. At this time the wind was light, but there was a heavy southeasterly swell, with undertow, and when about a mile inside the Cape Charles Lightship, at 4 p. m., on Monday, September 17th, the hawser parted again in the older part thereof. After a delay of an hour the line composed of the two hawsers, except as wasted by former partings, was readjusted, and the tow proceeded. On account of the approaching night, the course into Chesapeake Bay nearer to Cape Charles was deemed inadvisable, and the channel nearer to Cape Henry, although some five miles longer, was attempted, the weather at the time being propitious. But the swell ahead grew more violent, the wind increased until it reached 26 miles from 6 to 9 o'clock, 35 miles between 10 and 11 o'clock, and continued at about that velocity while the tug remained with her tow. The tide was strong ebb, with low water at Cape Henry at 9:46 p. m., and at Cape Charles at 10:28 p. m. Between 10 and 11 o'clock the smokestack of the dredge fell, and was securely lashed, although the fall injured the pilot house roof and crushed one of the small boats. No vital damage was done. However, the repeated breaking of the hawser permitted the dredge to roll heavily in the sea, and enabled the scow to come against her in a manner calculated more to excite alarm of the crew than to produce essential damage to the scow or dredge. Sometime before 11 o'clock the hawser again parted, this time in the newer part thereof. Thereupon the two men on the scow signaled, and were taken upon the tug. The tug then went alongside of the dredge, and received from her an 80 fathom 6-inch line—upon the offer of the dredge, as the tug claims; upon the request of the tug's captain, as some of the crew of the dredge state. If the use of this line imputes fault to anybody, as it does not, the master of the tug was the final judge of its sufficiency. The Margaret, 94 U. S. 494, 496, 24 L. Ed. 146. In any case the captain of the tug preferred it to his own hawsers, and used

it for towing, one end passed through the port chock to the port bitts of the dredge, inasmuch as the bridle of the dredge at the time of the last parting had dropped into the water and had not been drawn aboard, and the other end was made fast to the tug's stern. As a result, the dredge was towed by her port corner, or cornerwise. Soon thereafter the chock pulled out. Meanwhile the scow had been cut adrift, and the master of the tug hoped upon the changed tide to take the tow into the more tranquil waters of the bay. At 2:30 a. m. the hawser parted. The tow was then five or six miles to the southeast of Cape Henry Light, in the open ocean. The crew of the dredge gathered on the top of the house, and, as the tug came back alongside after hauling in the hawser, asked to be taken off, and jumped from the top of the house upon the stern of the tug, except the fireman, who left the dredge from her main deck. Nearly all the crew wore life-preservers. The wind was blowing as stated. There was a heavy swell. The night was dark but clear. The hawser had parted at 4 o'clock, and twice since that time. The smokestack had fallen. The scow had been cut adrift. The dredge was without a hawser, and had 10 inches of water. Her house had been strained somewhat, but was not essentially injured. Her pumps were of diminished use, because of the loss of the smokestack and consequent effect upon the draft of her fires, especially when she was not in motion, but the dredge was not seriously weakened, and, while the circumstances naturally prompted the crew to seek the safer position of the tug, the danger of the dredge sinking at the time was less to be dreaded than her escape from the tug. The captain of the tug seems to have raised no objection to the crew leaving the dredge, nor did he ask them to make fast a towing line before doing so, although he claims that he later asked one of the crew to go aboard the dredge and make a hawser fast, which request was declined. The tug circled about the dredge until about 3:30, when she started for Norfolk, where she arrived at about 7 a. m. There she took additional coal, and at midnight of September 18th left Norfolk, reaching the Capes about 3 a. m. of September 19th, cruised about 12 miles to the south and east of Cape Henry, and returned to New York. Meanwhile a wrecking steamer, Coley, belonging to the Merritt Wrecking Company, left Norfolk at 8:40 p. m., September 18th, reached Cape Henry about 11:40 in the night, encountered a somewhat rough sea, went down the coast until about 2:30 a. m. of September 19th, when she slowed for daylight. After daylight the scow was seen, and recovered in good condition, about W. by S. ½ S., and distant four miles from Caffey's Inlet station. Thereafter the Coley went to the southward for two or three miles, but returned without seeing any sign of the dredge.

There is sufficient evidence that the dredge drifted down the coast in apparently good condition, within sight of persons at Currituck life-saving station and Whale's Head live-saving station, respectively 40 and 45 miles south of Cape Henry, and that her wreckage came ashore at Kitty Hawk, about 65 miles south of such Cape, on Wednesday morning, September 19th. The keeper of Whale's Head life-saving station testified that he saw what is now considered to have

been the dredge, for several hours on Tuesday, the 18th of September; that he first saw it about noon, some ten miles to the northeast of the station; that he noticed it for five hours, and that it was in sight at 5 o'clock; that when opposite Whale's Head it was five or six miles off, and that it seemed to get nearer the shore as it drifted south. Tillett, one of the crew at Currituck life-saving station, also examined it through the glass, first seeing it about six or eight miles north, and eight or ten miles off shore, and continued to examine it from time to time during the day.

The Moran's abandonment of the dredge, and departure for, and delay at, Norfolk, are not excusable, and the fault is emphasized by her indolent and insufficient search. The excuses are (1) that the tug was in danger from the storm; (2) that it was useless to stand by the dredge, as she could not be retaken; (3) that the crew had abandoned the dredge. The first plea is obviously untrue. The weather on the night of the abandonment was doubtless boisterous, but several tugs anchored their tows in the general neighborhood of the entrance of the bay and kept near them all night, while the Moran, within an hour or two of daybreak, and in the face of no greater danger than brave seamen ordinarily encounter successfully, left the dredge to her fate, and not content, even on a flood tide, within the protecting shelter of the Cape, where the light could be awaited for pursuing and taking up the dredge, did not stop until she had reached the utmost security of Norfolk, 40 miles away, where she renounced practically all effort to reclaim her tow. The pilot boat Relief lay three or four miles inside the Capes, where she had gone that she might lie easier, but her pilot stated that he could have gone outside if occasion required. The tugboat Delmar, with a car float containing 28 cars in tow, during the night, bound for Norfolk, parted her hawser three times about midnight. After the tow anchored, her tug stood by until after daybreak. She was then inside and almost abreast of Cape Henry, and about a mile from the shore. The next morning the Delmar took her tow to Old Point Comfort. One of the Luckenbach tugs, the Ocean King, was towing to Norfolk the barge Brooklyn. She overtook and passed two miles away the Moran about 9 p. m. on Monday, when the latter was southwest of the lightship, between the lightship and the whistling buoy No. 2. The barge, a converted sailing ship, carried 2,600 tons. At 11 o'clock at night the Ocean King, with her tow, was abreast of Cape Henry; between 11 and 12 o'clock her hawser parted, and thereupon the tug anchored the barge by the whistling buoy. The engineer, a witness from the Ocean King, describes the anchorage as abreast of, and four miles off, Cape Henry. He stated: "We anchored the barge until daylight so we could pick her up. We couldn't pick her up that night. We just kept under steam, worked around the barge until daylight, and got her picked up at 6 o'clock in the morning." At 6 a. m. the weather moderated somewhat, and the Ocean King succeeded in pulling in her tow. Thus it appears that while the other tugs carried their tows into the bay, stood by them through the night, and delivered them when the day came, the Moran, with the morning not far away, left her valuable tow to float along down the coast to destruction. The Moran was a

powerful seagoing tug, large, new, and strong. She had withstood, without any marked danger or damage, the boisterous sea until the night was far gone. Having faced safely the weather for the greater part of the night, it is improbable that harm would have come to her during the approaching morning, and the further assurance of this is the fact that no tug or tow was injured seriously on that night, either while passing into the bay or lying near or within the Capes. Such experiences and the survival of the dredge for so many hours, and the retaking of the scow, recall certain language in the opinion in The Quickstep, 76 U. S. 671, 19 L. Ed. 767:

"But the claimants of the tug deny that their vessel was in fault, and insist that the disaster occurred by the violence of the storm and gale of wind which prevailed at the time. If this be so, how did it happen that two of the canalboats that got loose from the fleet survived the perils of that night? One of these boats anchored, and was saved without difficulty; the other, loaded with iron, drifted about, and was picked up the next morning without having sustained any damage. The fact that these boats did not experience any bad effects from the severity of this storm explodes the theory advanced by the claimants on the subject."

As to the second excuse, it is enough that the dredge was substantially in good condition for some three-quarters of an hour after her crew left her, and while the Moran was circling about her, and she was floating in apparently good preservation when seen all of the next day at various points down the coast. Why could not the Moran have retaken her? Even from the calmer waters of the bay the tug could have waited, and have come up with the slowly drifting dredge, and the moderating weather conditions favored her recovery. Lastly, it is urged that the fact that the crew left the dredge justified the Moran in abandoning her. That in itself is not a reason for a tug deserting her tow. There might be very good reason for the crew coming off, and yet for the tug to stand by. The crew left her because the tug did not hold the tow. If the dredge escaped, the crew feared the result; undoubtedly the happenings of the night had made the crew, one and all, fear to stay on the dredge. Surely an apprehension that would lead and justify men going from a ship in danger to a vessel in safety might not justify men in a place of safety deserting the endangered ship and allowing it to float away. There is no intention to suggest that the crew of the tug were cowardly, for they had faced the night almost to its ending; and it is considered that a sense of personal danger for himself, his men, or tug, did not influence considerably the departure of the Moran's captain. But surely his leaving his tow, almost on the edge of the morning, when it was floating successfully, and going 40 miles away, and staying away, showed neither good judgment, fidelity to his charge, nor that sturdy and obdurate endeavor to hold onto his tow that the law should demand under the conditions then existing. If the master of a tug may regard the tow as lost whenever there is a hard storm and his hawsers break, and the men on the tow come off, then Capt. Ellis was right. Such action is far from that cool judgment and dauntless endeavor to discharge his trust that should characterize the master of an American vessel. For the purposes of transportation, the tug has dominion over the tow (Transportation Line v. Hope, 95 U. S. 297, 300, 24 L. Ed. 477), and if in a

storm the hawser break, and prudence require the crew of the tow to board the tug, this does not justify the master of the tug in turning his back and abandoning the property intrusted to him. In the present case, the dredge was not a vessel in the ordinary sense. The engineer was nominally in charge of the dredge, but he was not a navigator, and had no occasion to be. The dredge could not be navigated; it was capable only of being hauled. The entire navigation was in the hands of the master of the tug. The arbitrary power of such a person upon his own vessel is well understood, and what he directed to be done under the circumstances existing at the time would be accepted by the crew of the dredge without dissent. Hence it is considered that, whoever may have been in charge of the dredge, he was not authorized, as against the captain of the tug, to exercise any such discretion as is suggested in The J. P. Donaldson, 167 U. S. 604, 17 Sup. Ct. 951, 42 L. Ed. 292. Certain of the crew of the dredge suggested that the tug should make some effort to save the dredge, either by standing by her, or by going to Norfolk and getting additional equipment and returning. But these suggestions were probably advanced with inconsiderable vigor, and perhaps diffidently, and the master was inattentive to them.

The plea is made that the master's judgment is best and should control. That is a rule to be honored in a proper case (The Hercules [D. C.] 75 Fed. 274; The E. Luckenbach, 51 C. C. A. 589, 113 Fed. 1017, affirming [D. C.] 109 Fed. 487; The J. P. Donaldson [D. C.] 19 Fed. 264, 266; The Packer [C. C.] 28 Fed. 156), but should not relieve all offending tugs. When a tug deserts her tow, there ought to be a good reason assigned for it. In the present instance, the master went away without a justifiable motive, without the influence of a warranted apprehension, with his tow afloat and not seriously damaged. He went because he lost hope, and he stayed away for the same reason; yet the evidence does not offer any substantial ground for his hopelessness. Neither danger, nor necessity, nor advantage, nor convenience, constrained the tug to go to Norfolk, or to remain there 17 hours; she obtained nothing but unneeded coal, and, if she needed a hawser, did not even inquire for one, although they were sold there. But whatever she needed she could have obtained in a brief time, and thereupon gone in pursuit. If the shelter of the bay was desirable, and the master was justified in seeking it, how does that excuse him? To excuse a tug for leaving and remaining away from her tow, there should be proof that the tow was sinking, or past saving, or that the tug was so injured or in such danger that it could not stay or return, or similar condition. Several cases are cited, which do not absolve the Moran, for, where they favor the tower, either the tug was injured or in danger, or the tow was beyond conservation, and departure was justified and return excused. In The W. J. Keyser, 6 C. C. A. 101, 56 Fed. 731, the tug abandoned a barge in the Gulf of Mexico, about 36 miles out from Pensacola, Fla. The latter's crew went off in a small boat, whereupon the tug cut the towing line and rescued the crew, who represented that the barge was in a sinking condition, was leaking badly, that they were unable to use the pumps, and were unwilling to return to her. Some of the crew stated that the

water was over the cabin floor. The opinion states that there were four feet of water in the hold; that she was taking water very fast, through openings in the deck and hawse pipe; that she "was in a sinking condition, and would probably go down in a few hours"; that the barge could not be towed without a person at the wheel; and that the quitting of the barge by the master and crew severed the contractual relations between her and the tug, so that any subsequent service would be salvage service. In The R. C. Veit (D. C.) 56 Fed. 122, it appeared that a tug attempted to pick up one of her scows that had gone adrift, but, being incumbered by another scow, and in danger of fouling her propeller in the trailing hawser of the drifting scow, she put into harbor, dropped the scow in tow, and went out and found the scow, which had been adrift at anchor in shoal water. Thereupon the tug returned and obtained aid, but meantime the scow had gone ashore. The tug was justified. In The Miranda (D. C.) 40 Fed. 533, affirmed in (C. C.) 43 Fed. 309, it appeared that the steamer Miranda undertook to tow a raft of logs by sea from Nova Scotia to New York. On the twelfth day out, the towing hawser parted in the midst of a heavy gale. The steamer lay by the raft for a time and then started for New York, arriving there four days later. The raft became a total loss. It was held that the insufficiency of the hawser was not proved, and that there was no fault in not sooner sending the Miranda out to look for the raft after the former's arrival in New York, as, by the time the steamer's necessary repairs had been finished, it had become evident that search was useless. In The Czarina (D. C.) 112 Fed. 541, it appeared that a steamship undertook to tow a large raft of timber from Puget Sound to San Francisco, and that when within two days' sail of the latter port the hawser parted, and the two went adrift. A strong wind was blowing, and the sea was so rough as to make it unsafe, in the judgment of the master, to attempt to recover it at the time, or to remain near it during the night; and he was also of the opinion that he could not keep it in sight if he remained, and would lose his bearings. Hence he proceeded to a port, where he communicated with his owners, and on the morning, and for two days following, he searched for the raft, but owing to the fog was unable to find it. It was recovered three weeks later by another vessel, 450 miles southwest of San Francisco, and brought in. It did not appear that the master erred in his judgment, or that he could have kept the raft in sight and recovered it if he had remained in the vicinity; and it was decided that his action in leaving it was not such negligence as rendered the steamer liable for damages. In The Clematis, 1 Brown, Adm. R. 499, Fed. Cas. No. 2,876, it was held that, when a tug abandons her tow of barges during a storm, the burden is upon the tug to show a sufficient excuse for such abandonment; but there must be a preponderance of proof that the action of the officers of the tug amounted to negligence; and that, where it was shown that the towlines parted in the night, during a storm of great severity, and the master of the tug was unable to pick up the line, to discover the lights of the tow, or to make any effort to regain it without great danger to the tug, he was justified in abandoning it. In The O. L. Halenbeck (D. C.) 110 Fed. 556, Judge Brown decided that the evi-

dence was sufficient to establish the claim that the action of an ocean tug in cutting adrift her tow, consisting of a dredge, four scows loaded with coal, and a water boat, during a moderate gale while off Cape Cod, and allowing them to drift on shore without any further effort to save them, was without necessity or justification, and rendered the tug liable for the loss.

Neither the tug nor her owner are liable on account of the hawser, or the use made thereof. It is urged that the owner guaranties the equipment of the tug; that is, that he engages absolutely that each line, rope, etc., when properly used, shall bear without breaking the strain made necessary by its office, caused by the ordinary violence of wind and weather, and that he will be liable for any damages happening under such conditions approximately from an unworthy sea line. It would be interesting to discover by what analogy or reasoning a tower not held to be a common carrier (The Syracuse, 79 U. S. 167, 20 L. Ed. 382; The Margaret, 94 U. S. 494, 497, 24 L. Ed. 146; The J. P. Donaldson, 167 U. S. 603, 17 Sup. Ct. 951, 42 L. Ed. 292) is regarded as an insurer of his tug's equipment. Mr. MacLachlin, in his Law of Merchant Shipping, states the law as follows:

"The employment of a steam vessel by the master or owners of another ship, for the purposes of towage, is a contract which implies the exercise of diligence, care, and reasonable skill in the fulfillment of their engagement by the parties to it on both sides, and their agents and servants, the master and crew of the tug, and the master and crew of the ship in tow.

"The parties to the contract contemplate risk in the performance of it, the risk of winds and waves, and of obstacles, floating or fixed, that lie about or in their path. They both engage to be ready, armed with diligence, vigilance, and competent skill, against these risks, and besides this, on the part of the tug, with such a crew, tackle, and equipments as are reasonably to be expected in a vessel of her class. The Galatea, Swab. 349; The Minnehaha, 30 Law J. Adm. 211, 212. With all this performed, if there be, notwithstanding, inevitable accident and consequent damage to one of the parties, there is no liability in the other. But neither may by his fault or negligence aggravate the risk of the other with injury to him, without liability for the damage accrued, unless the other have contributed to the loss by his own fault or negligence. The Julia, Lush. 224. In all this it is assumed on both sides, when the contract is made, that the risk will be no more than ordinary, under ordinary bad weather.

"But there is no implied warranty on the part of the tug to bring the tow to the point of destination under all circumstances and at all hazards. The Minnehaha, 30 Law J. Adm. 211. She engages to use her best endeavours for that purpose; but she is relieved from her obligation if she be prevented by vis major, or by accidents not contemplated, which render performance of her contract impossible. The Minnehaha, 30 Law J. Adm. 211.

"She is not relieved, however, from her obligation because unforeseen difficulties occur in the completion of her task—because the performance of her task is interrupted or cannot be completed in the mode in which it was originally intended, as by the breaking of the ship's hawser. But if, in the discharge of her task, by reason of the sudden violence of winds or waves, or other accidents beyond the control of and without default in the tug, the tow is placed in danger, and the tug incurs risks and performs duties which were not within the scope of her original engagement, she is entitled, on proof of this, if the ship be saved, to claim as a salvor instead of being restricted to the sum stipulated for mere towage. The Minnehaha, supra; The Pericles, Brown & L. 60. The Charles Adolphe, Swab. 153; The Albion, Lush. 282; The Robert Dixon, 42 Law T. (N. S.) 344. Such a remuneration under the supposed circumstances becomes her right; but in such circumstances it is not optional with her whether she will render the services—she is bound to do

so. This is implied in her òriginal contract, from which she is not relieved except by circumstances of difficulty that render the performance of it impossible. The Saratoga, Lush. 318; The Minnehaha, supra; The White Star, L. R. 1 Adm. & Ecc. 66."

In The Syracuse, 79 U. S. 167, 20 L. Ed. 382, and The Margaret, 94 U. S. 497, 499, 24 L. Ed. 146, it is said that the care and skill required of persons in the management of the towing boat must be reasonable. In The J. P. Donaldson, 167 U. S. 403, 17 Sup. Ct. 951, 42 L. Ed. 292, it is stated that "the contract requires no more than that he who undertakes to tow shall carry out his undertaking with that degree of caution and skill which prudent navigators usually employ in similar services." Notwithstanding the holding in The Francis King, 7 Ben. 11, Fed. Cas. No. 5,042, that, in any case of disaster arising from a failure of the hawser, it is incumbent upon the tug to show plainly that its failure arose from no defect in quality or size, the rule is firmly established that "the burden is always upon him who alleges the breach of such a contract (of towage) to show either that there has been no attempt at performance, or that there has been negligence or unskillfulness to his injury in the performance. Unlike the case of common carriers, damage sustained by the tow does not ordinarily raise a presumption that the tug has been in fault" (The J. P. Donaldson, 167 U. S. 603, 17 Sup. Ct. 951, 42 L. Ed. 292; The Webb, 14 Waii. 406, 20 L. Ed. 774; The Burlington, 137 U. S. 391, 11 Sup. Ct. 138, 34 L. Ed. 731; The L. P. Dayton, 120 U. S. 337, 351, 7 Sup. Ct. 568, 30 L. Ed. 669; The Startle (C. C.) 115 Fed. 555, 560, 561)—although it is said, in The Webb, supra, "There may be cases in which the result is a safe criterion by which to judge of the act which has caused it"; and the case of a ship towed on a known and easily avoided shoal is instanced as sufficient evidence of unskillfulness or carelessness in the navigation of a tug, in the absence of explanation.

But if it be agreed that the Moran engaged, absolutely and at all events, irrespective of negligence, to have such necessary towing hawser or hawsers "as are reasonably to be expected in a vessel of her class," there was a further implied stipulation that the hawser should not be subjected to more than ordinary risks. In fact, a hawser is seaworthy when it is sufficient to resist the violence of ordinary winds and weather. When the dredge was lost there was a combination of southeasterly swell, a condition expectable at times at that place, a northwest wind amounting to a gale of 35 miles per hour, a wind not uncommon or usually hurtful to navigators, and an adverse ebb tide, later changing to a favorable flood tide. Such a combination might be expected, as tempests are expected by seafaring men, but it was not ordinary. It was in fact an exceptionally stormy night for towing. Hawsers were broken on two other tows, and several tugs and tows were obliged to anchor or discontinue their voyage, and lie wholly or partly within the shelter of the Capes. The law does not contemplate that the owner should provide a hawser that would absolutely hold the dredge under the conditions then existing. Upon the trial, the excellence of the hawser in material and manufacture was shown, although it was condemned by an expert in its final state. Any fragility or impairment of fiber of the hawser was a condition expect-

ant upon the strain of this towing service, when for two days and one night the burden of the dredge and scow tended to weaken it, and on the second night the severe weather conditions to exhaust its vitality. A judgment from inspection succeeding such an experience is not very helpful. At the earlier time the newer hawser was excellent in material and manufacture; as it appeared on the trial its fiber showed to an expert eye infirmity traceable to the very kind of usage to which it had been subjected in this adventure. Accusation of primary inability to perform a given service, after suffering the shock of that very service, cannot be sustained by showing conditions that would result naturally therefrom. The hawser's vitality was sapped by service, and then the absence of life was tendered as evidence that it was not worthy of such use. By such method of proof, ruin in service is used to condemn participation therein.

It follows from these views that the duty resting immediately on the owner was discharged as regards the provision of the new hawser, which broke between 10 and 11 o'clock on Monday night. The older hawser parted on Sunday night, but the owner had provided a newer and adequate one, which the master could have used at that time. If there was any fault it was that of the master. The older hawser broke again Monday afternoon. But the towing at that time did not absolutely require the use of the old line, and, if there was any negligence in its use, it was still that of the master and not of the owner. The new line was 900 feet long, and, on a sea then disturbed only by a southeasterly swell, it furnished sufficient scope of line for the purposes of safety. The conjoined lines made easier towing and accelerated the voyage, but the owner did not guaranty that he would furnish lines sufficiently long to make the easiest towing or earliest arrival. The greater speed and ease with which the tow was taken along perhaps more than compensated for the detention. The only harm arose from the detention and injury to the dredge while awaiting readjustment of the hawser after parting, but such injury to the dredge as occurred on Sunday night, and on the afternoon of Monday, was inconsiderable, and was not the proximate cause of the loss of the barge. Hence, the injury from the use of the old line is confined to some two hours of delay. How much was gained by the greater scope of hawser afforded by the conjoined lines does not appear, but the tow traveled from Delaware Breakwater to Cape Charles Light, between 6 a. m., September 16th, and 4 p. m., September 17th, a distance of 125 miles, in 35 hours, including two hours' detention, or at the rate of more than $3^4/_{10}$ miles per hour, with a clumsy dredge and an impeding scow. Such progress was sufficient. It is urged that the failure to arrive in time to pursue the Cape Charles entrance necessitated the tow traveling five miles farther, whereby she encountered more serious weather. At the time the captain of the Moran decided to pursue the Cape Henry entrance, there were no unusual storm conditions present or forecast, nor had there been since the tug left the Delaware Breakwater. It would be a stringent rule that would entail upon the tug all damages arising from a sudden storm which it might have avoided if it had not been detained for two hours by the breaking of the hawser, which had been used in good weather for the purpose of giving

greater scope of line for easier and faster towing, although, nicely tested, the hawser was not seaworthy for the heavy draft to which it was subjected. In The Startle (C. C.) 115 Fed. 555, it was decided that delay by a tug in proceeding with its tow, or other errors in navigation, although negligent, did not render it liable for an injury to the tow caused by the breaking away and loss of some of the boats while anchored, where there was no direct causal connection between such acts and the loss, which resulted directly from intervening causes. The opinion states:

"There are always many antecedents to a given catastrophe, but for the existence of which the result inquired about would not have occurred. It is, however, only the direct and immediate cause, under the control of human agency, which can be judicially considered." (Citing cases.)

In The E. V. McCaulley, 33 C. C. A. 620, 90 Fed. 510, the disconnection between the negligent act and loss are noticed. In The W. E. Cheney, 6 Ben. 176, Fed. Cas. No. 17,344, there was an interruption of the towing service for two days, and after it was resumed the tow was lost in a storm. The court put the burden of accounting for the deviation upon the tug. The case was one of serious deviation and temporary abandonment, and is quite different from a two-hours detention from the parting of towing lines on a course of 125 miles, during which the use of a hawser too weak for the load facilitated the towing.

It follows from the foregoing views that the abandonment of the dredge, and continued absence therefrom, on the part of the tug, was negligent, and was the sole proximate cause of the loss of the dredge, and that the tug is liable for such loss; that the owner of the tug was without fault, and may limit his liability; that the respondents Messrs. Luckenbach are not liable; that the scow was cut loose by the crew of the dredge, and that no recovery can be had therefor.